FILED
02 DEC 19 AM 10:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ALFREDO AMECA-RODRIGUEZ and JULES LEYVA,

Plaintiffs,

v.

PERFORMED LINE PRODUCTS,

Defendant.

CV 01-JEO-2485-S

ENTERED
DEC 19 2002

**MEMORANDUM OPINION**

In this action, plaintiffs Alfredo Ameca-Rodriguez ("Ameca") and Jules Leyva ("the plaintiffs") assert negligence, recklessness, outrage, intentional infliction of emotional distress, and loss of consortium claims against defendant Performed Line Products ("PLP" or "the defendant") as a consequence of a work place injury that resulted in the loss of Ameca's left eye. (Doc. 1).[1] Presently before the court is the defendant's motion to dismiss the first amended complaint, or in the alternative, for summary judgment (doc. 13), and various motions to strike certain evidence (doc. 17, 18, 19, 22, 25, and 30). The issues have been fully briefed by the parties. Upon consideration, the court finds that the defendant's motion for summary judgment is due to be denied in part and granted in part and the defendant's motions to strike are due to be granted in part and denied in part.

[1] References to "Doc. ___" are to the numbers assigned by the Clerk of the Court to a particular pleading. References herein to "Ex. ___" are to the exhibits attached to each document in a pleading. References to "p. ___" are to the page.

34

## FACTUAL SUMMARY[2]

Ameca moved from Mexico to Alabama with his wife and children and secured work through Briggs & Briggs ("Briggs"), an employment agency. (First Amendment of the Complaint ("Complaint") ¶ 4).[3]  Briggs paid his wages, calculated his withholdings and maintained workmen's compensation insurance and benefits for Ameca. (*Id.* at ¶ 5, Affidavit of Todd Garzarek ("Garzarek") at ¶ 6).[4]

Briggs sent Ameca to work at PLP's manufacturing plant in Alabaster, Alabama, where PLP manufacturers cable anchoring and control hardware systems. (Complaint at ¶ 4 and ¶ 5). PLP paid Briggs a fee for the use of their employees which covered the hourly wage, the costs of maintaining the insurance, overhead for Briggs' operations and a profit. (Affidavit of Robert L. Weber ("Weber") at ¶ 4).[5]  When the incidents giving rise to this suit occurred, Ameca worked as a metal grinder at PLP's plant in Alabaster. (Complaint at ¶ 6).

On February 11, 2000, a metal particle entered Ameca's left eye while he was grinding metal. (Affidavit of Cecil Jones at ¶ 5). Ameca reported what had happened to his supervisor, Cecil Jones ("Jones"), who placed eye drops in Ameca's eye and sent him back to work. (Affidavit of Jones at ¶ 5).[6]  Jones did not send Ameca to a physician, nor did Ameca receive any

---

[2] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiffs. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[3] The amended complaint is located at document 7.

[4] Garzarek's affidavit is located at document 15, exhibit 3.

[5] Weber's affidavit is located at document 13, exhibit A.

[6] The affidavit of Jones is located at document 15, exhibits 1.

other medical attention at that time. (Jones at ¶ 5). Ameca did not seek medical attention on Saturday or Sunday (February 12th and 13th) because he did not know any physicians, nor could he afford one. (Affidavit of Ameca-Rodriguez at ¶ 12; Complaint at ¶ 12).[7]

On Monday, February 14, 2000, Ameca returned to work at PLP and asked if he could go to the doctor but PLP did not give him permission to leave work. (Complaint at ¶ 13).[8] On Tuesday, February 15, 2000, while grinding metals, Ameca collapsed on the floor of his work area, apparently due to pain caused by his eye injury. (*Id.* at ¶ 14). At that point, PLP employee, Mayra Diaz ("Diaz"), intervened for Ameca and got permission from PLP to allow him to go to a doctor. (Affidavit of Mayra Diaz at ¶ 8).[9] Diaz then called the doctors' office and explained what had happened to cause the injury, when the injury had occurred, and that Ameca had been experiencing a great deal of pain. (*Id.* at ¶ 9).

Ameca went with an interpreter to Comptrac, a medical facility designed "to evaluate, diagnose, refer to a specialist, and/or provide treatment" for workers injured on the job. (Complaint at ¶ 7). There Ameca saw Dr. Roberts, the attending physician. (*Id.* at ¶ 16). By this time Ameca's eye had become visibly red and swollen. (*Id.* at ¶ 16). Dr. Roberts sent Ameca back to work "without restrictions." (*Id.* at ¶ 17; Diaz at ¶ 10).

On Friday, February 18, 2000, Ameca began to loose vision in his left eye and began feeling pain in his right eye. (Complaint at ¶ 19). Diaz intervened again and Ameca received permission to go to the doctor. (Diaz at ¶ 12). However, this time Ameca went to the emergency

---

[7] The affidavit of Ameca is located at document 26, exhibit 5.a.

[8] This statement is not supported by any evidence in the affidavits or other exhibits before the court.

[9] The affidavit of Diaz is located at document 15, exhibit 2.

room at Shelby Baptist Medical Center in Shelby County, Alabama. (*Id.*; Complaint at ¶ 20). Dr. S. Rhodes examined Ameca in the emergency room and determined that a piece of metal had become embedded in his left eye. (Complaint at ¶ 20).

On Monday, February 21, 2000, Ameca saw Dr. Bruce Eich, an ophthalmologist, and learned that "an intraocular foreign body was embedded in his left eye and . . . that there was a hole in his eye." (Complaint at ¶ 21). Due to the difficulty of repairing this kind of damage, Dr. Eich referred Ameca to a retinal surgeon, Dr. Richard M. Feist. (*Id.*). Dr. Feist performed surgery and attempted to repair the damage to Ameca's left eye. (Complaint at ¶ 23). Unfortunately, because so much time had past since the injury had occurred and the extensiveness of the injury, Ameca had already suffered a total retinal detachment. (*Id.*).

Ameca lost all vision in his left eye, had no light perception, and, according to Dr. Feist, would never regain any useful vision in his injured eye. (Complaint at ¶ 24). Ameca continued to experience pain and inflamation in his blind eye and eventually Dr. Feist removed the eyeball completely from the scleral shell. (*Id.* at ¶ 25; Diaz at ¶ 15). Because of this final surgery, Ameca also "lost the optical sensation of depth perception" in his right eye. (Complaint at ¶ 26).

Ameca could not return to work at PLP. Briggs sent Ameca home. Briggs indicated that it needed to investigate the incident. (Complaint at ¶ 27). Unable to secure other work during this time, Ameca could not support his family and they were evicted from their apartment. (*Id.* at ¶ 28). Eventually, Ameca's wife and children left the United States and returned to Mexico to seek help from family there. (*Id.*; Diaz at ¶ 18).

Ameca filed suit and recovered workmen's compensation benefits from Briggs in the Shelby County Court. (Complaint at ¶ 27). Thereafter, the present litigation was filed on

October 3, 2001. (Doc. 1).

**MOTIONS TO STRIKE**

The defendant has moved to strike various portions of the affidavits that were submitted by the plaintiffs. (Doc. 17, 18, 19, 22, & 25). The defendant asserts that the affidavits (1) are not based on personal knowledge or otherwise fail to affirmatively demonstrate that the affiant is competent to testify to the matters contained therein; (2) contain improper hearsay; (3) contain self-serving legal conclusions; and (4) in many instances contain irrelevant information. The plaintiffs have filed a terse response to the motions to strike the affidavits of Mayra Diaz, Todd Garzarek, and Cecil Jones. (Doc. 20). They assert the motions are frivolous, are intended to delay this litigation or embarrass the plaintiffs, and are not rational. (*Id.*). They have also filed a response to the motion to strike the affidavit of Ameca, asserting it is baseless. (Doc. 22).

FEDERAL RULE OF CIVIL PROCEDURE 56 states, in pertinent part, that affidavits in support of or in opposition to a motion for summary judgment ". . . shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e). "If a supporting or opposing affidavit fails to conform to Rule 56(e), the opposing party may move to strike the nonconforming portion [or portions]." *Ali v. City of Clearwater*, 915 F. Supp. 1231, 1236 (M.D. Fla. 1996), *citing Interfase Marketing, Inc. v. Pioneer Technologies Group, Inc.*, 1993 WL 229601, *2 (M.D. Fla. June 23, 1993) and *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1529 (M.D. Fla. 1989).

To assist the parties and any reviewing court, the undersigned has reproduced the contested affidavits in their entirety and the objections of the defendant. Each objection has been

examined and ruled upon individually. With regard to the general objections asserted by the defendant, the court makes the following preliminary findings and holdings.

Concerning the defendant's claim that the affidavits are not premised on personal knowledge, the Eleventh Circuit Court of Appeals recently stated:

> The Rules are clear: "Supporting and opposing affidavits *shall* be made on personal knowledge." FED. R. CIV. P. 56(e) (emphasis added). Rule 56(e)'s personal knowledge requirement prevents statements in affidavits that are based, in part, "upon information and belief"-- instead of only knowledge -- from raising genuine issues of fact sufficient to defeat summary judgment. *See Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 851 (11th Cir. 2000) ("upon information and belief" insufficient); *Fowler v. Southern Bell Tel. and Tel. Co.*, 343 F.2d 150, 154 (5th Cir. 1965) ("knowledge, information and belief" insufficient); *Robbins v. Gould*, 278 F.2d 116, 118 (5th Cir. 1960) ("knowledge and belief" insufficient). [ ] Likewise, an affidavit stating only that the affiant "believes" a certain fact exists is insufficient to defeat summary judgment by creating a genuine issue of fact about the existence of that certain fact. *Jameson v. Jameson*, 176 F.2d 58, 60 (D.C. Cir. 1949) ("Belief, no matter how sincere, is not equivalent to knowledge."); *see also Tavery v. United States*, 32 F.3d 1423, 1426 n.4 (10th Cir. 1994); *Hansen v. Prentice-Hall, Inc.*, 788 F.2d 892, 894 (2d Cir. 1986). Even if the affidavit is otherwise based upon personal knowledge (that is, includes a blanket statement within the first few paragraphs to the effect that the affiant has "personal knowledge of the facts set forth in th[e] affidavit"), a statement that the affiant believes something is not in accordance with the Rule. *See Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1377 (9th Cir. 1978) (equating "I understand" statement in affidavit to inadmissible "I believe" statements and concluding that statement is inadmissible despite general averment to personal knowledge at beginning of affidavit). The district court's treatment of the "believe" portion of Hedge's statement in his affidavit -- that Hedge "observed motion in the red car which I believe was [Davis] raising his hands towards the roof of his car in an attempt to surrender" -- as sufficient to create a fact issue about raised hands was error. [ ]

*Pace v. Capobianco*, 283 F.3d 1275, 1278-79 (11th Cir. 2002) (footnotes omitted). To the extent that information in the affidavits at issue is not based on personal knowledge, it will not be considered.

Regarding hearsay testimony, the Eleventh Circuit in *Macuba v. Deboer*, 193 F.3d 1316,

1323 (11th Cir. 1999), explained that "[s]ome courts including our own, appear to have restated the general rule to hold that a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be 'reduced to admissible evidence at trial' or 'reduced to admissible form.'" ( *citations omitted*). Therefore, if the statement by the affiant could be reduced to admissible evidence at trial, it will be considered by the court on the present motion. Additionally, to the extent that objected-to statements are offered not to prove the truth of the matter contained therein, but only to prove that the statements were made and resulted in certain action, they will be considered. *See* FED. R. EVID. 801(c).

Finally, the court notes that improper, self-serving legal conclusions and irrelevant statements will not be considered. They will be struck.

**Affidavit of Mayra D. Diaz**

The first affidavit is that of Mayra Diaz, a co-employee of Ameca. The defendant moves to strike various statements and whole paragraphs therein premised on many of the grounds asserted above. (Doc. 17). The motion is due to be granted in part and denied in part as stated below.

> 1. My name is Mayra D. Diaz. I am over 19 years of age. I live at 2512 Hawksbury Lane, Birmingham, Alabama 35226.
>
> 2. I know Alfredo Ameca-Rodriguez (Alfredo). I met him at Preformed Line Products Company (PLP), located at 1909 Hwy 87, Alabaster, Alabama 35007. I am bilingual. I was an employee of PLP in its Administrative offices.

No objection has been made to any portion of these paragraphs. The court will consider them in their entirety.

> 3. ~~Alfredo was employed by Briggs & Briggs, Inc. (Briggs). He came to PLP as a temporary worker. Alfredo's contract of employment was with Briggs;~~

> ~~his salary was paid by Briggs; his pay check was cut by Briggs; the insurance for Workmen's Compensation came solely from Briggs; Briggs had the power to stop Alfredo from working at PLP.~~

The defendant objects to the entire paragraph. It asserts that it contains legal conclusions and the source of the information is unclear. (Doc. 17 at 4). The court agrees that the source of this information is unclear and that the affiant has not established that she is competent to testify to these matters. Therefore, the paragraph is due to be struck in its entirety.

> 4. ~~To understand well how disconnected PLP was from any employment connection with Alfredo, one may note that following Alfredo's eye injury at the premises of PLP, Alfredo had no money, he was claiming to have much pain; he needed medicines for his eye; so~~ I paid for them with my own money. PLP did not reimburse me. ~~I was told by PLP that they were not Alfredo's employer, that Alfredo was solely Briggs' employee.~~ The cost was only $17.71, ~~but they did not want to pay it.~~ I called Briggs, and they gave me a check for that amount. ~~See Exhibit "1".~~

The defendant objects that these statements "[are] a mixture of conclusory opinion and facts not in evidence." (Doc. 17 at 4). The court agrees with the defendant. The stricken statements are either conclusory or not sufficiently premised on personal knowledge.[10] In considering the remaining portions, the court recognizes that Diaz paid for Ameca's medication and then was reimbursed by Briggs. Although the defendant objects to the attached check as being "an unauthenticated document," the court finds that it could be made admissible for trial and therefore will be considered.

> 5. ~~PLP's employees did not want to work under the low paid and unsafe conditions of the metal grinding area. Alfredo was paid by Briggs about minimum wage. The grinding area air was full of metallic dust, and~~ there was no dust collector.

---

[10] The statement, "I was told by PLP that they were not Alfredo's employer, that Alfredo was solely Briggs' employee," cannot be considered because Diaz has failed to attribute the statement to a particular person so the court cannot tell whether it would be admissible at trial.

The defendant objects to the foregoing portions, asserting that much of the paragraph is comprised of information that Diaz is not competent to testify regarding. The court agrees that Diaz is not competent to testify to the motivations of the PLP workforce, and, thus, strikes the first sentence.[11] The defendant has "lined out" the second sentence but has given no specific supporting objection for it. It does in its general objections state that there is no evidence in the affidavit that Diaz is competent to testify as to such information. This objection is well-founded. Therefore, the second sentence will be struck. As to the last sentence, the defendant objects that the statement is irrelevant to and unhelpful for a clear understanding and determination of the facts in issue. However, the questions of whether there was metallic dust in the workplace, and the degree of such, are relevant to the need for a dust collector, which is relevant to the outrage and emotional distress claims. Additionally, because it is evident that Diaz worked there, she is competent to offer such testimony at this juncture.

> 6. ~~Alfredo was a very polite and kind gentlemen. He was very respectful to people. When he became injured, that courtesy and respect was not returned to him by the people at PLP.~~

The defendant objects to this paragraph as being irrelevant. The court agrees. This paragraph is due to be struck in its entirety as none of the "facts" or information contained therein have any relevance to the matters at issue in the present motion.

> 7. Alfredo was grinding metals at PLP on February 11, 2000, ~~when a metal particle, from somewhere went into his left eye. He notified at once his supervisor, Cecil Jones (Cecil). Cecil put some eye drops and sent Alfredo back to work grinding metals. No leave to seek medical assistance was given to him.~~

The defendant objects that Diaz does not have sufficient personal knowledge to testify to

[11] The statement is of questionable relevance as well.

these matters. To support this, the defendant asserts that Diaz can only testify if she witnessed the events, but that "she did not witness such facts." (Doc. 17 at 6). Nothing in the affidavit demonstrates that Diaz witnessed the incident. To the contrary, it states that she worked in the administrative office. Accordingly, the objected-to portions of this paragraph must be stricken under the circumstances.

> 8. ~~PLP management knew what happened to Alfredo.~~ We talked about it in the office. ~~I was shocked to learn that several days had passed and Alfredo had not yet seen a physician. I felt that the treatment of Alfredo was totally outrageous and inhumane, so~~ I intervened to have him sent to a physician. It was already February 15, 2000, ~~when Alfredo was allowed leave to see a physician~~.

The defendant objects that Diaz is not competent to testify as to what PLP management knew about the injury. (Doc. 17 at 6). It further states that the source of the information is unclear from the affidavit. (*Id.*). The court agrees that she has not demonstrated sufficient competence to testify as to the knowledge of PLP. To the extent the first sentence states a conclusion it is due to be struck. To the extent it can be read in conjunction with the second sentence to reach the conclusion that she spoke with someone with PLP, it is allowed. The court also agrees that the affidavit is not the proper format for the affiant to express her shock, nor her feelings about the treatment that Ameca received. The defendant did not state a specific objection to the "lined out" portion of the last sentence and the court cannot identify any reason why it should be struck, particularly since Diaz worked in the defendant's administrative office. Therefore, except for the first sentence, as discussed above, and the last sentence, the court will strike the portions of that paragraph as requested by the defendant.

> 9. I interpreted for Alfredo on the telephone and ~~explained to the people at the medical place that while he was grinding metals, a piece of metal, had entered his eye, probably at high speed, that it happened four days before, and that he was~~

> ~~having much pain. A bilingual person accompanied Alfredo to see the physician~~.

The defendant objects to the majority of this paragraph as being hearsay. However, under the FEDERAL RULES OF EVIDENCE, a statement is hearsay only if it is "offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). The statements objected to are being offered not for the truth they contain but to evidence *that* they were made. Therefore, under the hearsay definition, they would not be excluded. Additionally, the FEDERAL RULES OF EVIDENCE allow a hearsay exception for statements made "for purposes of medical diagnosis or treatment." FED. R. EVID. 803(4). According to the exception, such statements can include "describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." *Id.* Thus, the court is convinced that the statements, fall within an exception to the hearsay rule. Therefore, the first sentence will not be struck. As to the last sentence, the defendant objects that the affiant is not competent to testify as to whether an interpreter accompanied plaintiff to the physician's office. It is clear that Diaz was at the office and that she is bilingual. Under the circumstances, the court finds that the last sentence is not due to be struck.

> 10. Alfredo came back to PLP with a paper from the doctor saying that he was to go back to work "without restrictions". ~~PLP was aware of the facts, but, claiming not to be Alfredo's employer they ignored the issue. I had no authority to press any further~~.

The defendant objects that Diaz is not competent to testify as to the defendant's knowledge or the reasoning behind any action it may or may not have taken. The defendant also objects on relevancy grounds to the last sentence. The court agrees. Diaz is not competent to

make broad conclusory statements about PLP's knowledge and her authority is not at issue in this matter.

> 11. On Friday, February 18, 2000, I went to the foundry. Alfredo approached me, ~~and I saw this gentle person showing a face of panic and despair.~~ His eye was visibly red and tearful. ~~He said that he was having much pain, that he was not able to sleep at night, and that he had no money to go to a doctor on his own, nor did he know where to go~~.

The defendant objects that these portions of the affidavit are conclusions. The court agrees that the affiant is offering conclusions premised on her opinion and belief. The statements also include hearsay statements not allowable at this juncture under the FEDERAL RULE OF EVIDENCE 801. Therefore, the motion is due to be granted in part as requested by the defendant. To the extent that the statements of Ameca are offered nor for the truth of the same but to show what Diaz did in response thereto, they are allowed.

> 12. I had to intervene again in order for PLP management to allow Alfredo to take off from his grinding post to see a doctor for his eye. Later I got a call from the Emergency Department of Shelby Baptist Medical Center (Shelby Hospital). ~~Since the Workmen's Compensation doctor did not see Alfredo, he went there~~.

The defendant objects, and the court agrees, that Diaz has not established the source of her knowledge. Therefore, she is not competent to testify which doctors would not see the plaintiff.

> 13. The physician at Shelby Hospital called me at work ~~and explained that Alfredo's injury was very serious and that it was necessary for Alfredo to see an ophthalmologist immediately. I later learned that the ophthalmologist never showed up~~.

The defendant objects to the first sentence to the extent it contains hearsay. The court agrees that the statement concerning what the attending physician reported to the affiant is

hearsay and therefore is due to be struck.[12] The second sentence is obviously based on hearsay and is due to be struck.

> 14. The following Monday, Feb 21, 2000, Alfredo came to work, and he looked very bad. ~~The smiling and gentle person that I knew had a very hard facial expression, and he appeared to me in state of panic and desperation. That afternoon Alfredo saw an ophthalmologist for the first time, 11 days after his eye injury (since February 11).~~

The defendant objects, and the court agrees, that the second sentence is based on an opinion of the affiant and does not appear to be given in order to support a determination of a fact in issue as required by the FEDERAL RULES OF EVIDENCE and thus is due to be struck. The defendant objects to the third sentence as being based on information and belief since the affiant has not demonstrated her competency to testify as to these facts. However, reading this sentence in conjunction with the next paragraph, it is reasonable to conclude that Diaz did have personal knowledge of his seeing an ophthalmologist because of her continued involvement in the Ameca's medical care and treatment, acting as his interpreter when he visited several physicians.

> 15. I interpreted for Alfredo to see several physicians, and every time the news about his eye vision became worse. At one point ~~Alfredo totally lost vision of his left eye, and~~ he started complaining about pain in his right eye also. His blind eye ball was later surgically removed from the eye socket. I saw his face with an empty cavity where his left eye used to be.

The defendant objects, and the court agrees, that the affiant does not and could not have personal knowledge of whether Ameca was losing vision in his left eye, and therefore the statement is based on hearsay and is due to be struck.

> 16. ~~Following February 24, 2000, Alfredo was not paid any wages or~~

---

[12] There is no indication in the affidavit that this portion of the first sentence is being offered for any other purpose other than to demonstrate the seriousness of Ameca's injury. To the extent it is offered simply to show what actions were taken after she was told this by the doctor, the statement is allowed.

> ~~offered any money or support by either PLP or Briggs. PLP claimed it was not "their problem" since Alfredo was Briggs' employee. Briggs admitted being Alfredo's employer, but claimed to be investigating the accident~~.

The defendant objects, and the court agrees, that Diaz has not established sufficient personal knowledge of these facts to testify as to the plaintiff's financial status or to any benefits paid by either PLP or Briggs. Therefore, the statements to that effect must be struck. Also, the statements regarding what PLP claimed or what Briggs admitted are not properly attributed to a particular person and therefore must also be struck.

> 17. ~~Unable to pay the rent, Alfredo, his wife, Jules, and children were evicted from their apartment.~~ My husband and I tried to help them. ~~Alfredo went to see an attorney, but there he was asked for money in advance to pay for the cost of obtaining his medical records. Not having the money he left~~.

The defendant objects and the court agrees that the statements made in this paragraph, with the exception of the help offered by Diaz personally, do not appear to be based on personal knowledge and, thus, must be struck.

> 18. We found a Spanish speaking attorney, the present attorney, who filed suit against Briggs under Workmen's Compensation. ~~In the mean time~~ [sic] ~~Alfredo and his family were sleeping in the cars of friends and eating at the charity of others. Alfredo's wife and children had to seek help from family in Mexico. Alfredo stayed in the U.S., jobless, waiting for a determination on his case~~.

The defendant objects that the statements herein are based on information and belief and clearly are not relevant to the issues presented in this case. In regards to the conditions the family was living in, the affidavit demonstrates that Diaz had sufficient personal knowledge to support her statements regarding the financial situation of Ameca and his family. She stated earlier that she and her husband were giving aid and assistance to the family. However, they are not relevant to a determination of the present issues. The remainder of the paragraph appears to be

conclusory.

> 19. ~~I am well aware of how little PLP cared for the temporary workers. Those Hispanics endured not only very low pay, but very strict permission policies for leave, including medical leave.~~ I have, also, first hand knowledge that requests for a dust collector were made to PLP management and owners by workers and supervisors, ~~but PLP did not want to spend the money. The dust and particles in the grinding area were sufficiently dense to justify a dust collection device. PLP totally misrepresented the need for the dust collector by not admitting the true quantity of metallic dust particles in the metal grinding area~~.

The defendant objects and the court agrees that the affiant is not allowed to testify as to what PLP cared about. The defendant also objects that the second sentence is vague, overly broad, and draws conclusions. The court agrees that the statements therein are conclusory and are due to be struck. As to the need for a dust collection system, the defendant objects that Diaz is not competent to testify as to the motives of PLP for not installing a dust collector and statements relating to that are due to be struck. The court agrees.

> 20. ~~PLP's conduct toward Alfredo was inhumane and totally outrageous. The way that Alfredo was treated would be improper even for an animal. PLP management was well aware of what was going on at the plant when Alfredo's eye was injured, but they claimed it not to be their problem, but Briggs'. PLP knew that the workers at the grinding area were exposed to dangerous levels of metallic dust and metal particles, and that a dust collector could have remedied the situation, but PLP did not want to spend the money~~.

The defendant objects, and the court finds, that this paragraph is due to be struck in its entirety because it contains improper conclusory statements, opinions, and speculation.

**Affidavit of Todd Garzarek**

The second affidavit was prepared by Todd Garzarek, an employee in PLP's Human Resources Department. The defendant makes similar general objections to the affidavit and many specific objections as are detailed below.

1. My name is Todd Garzarek, I live at 92 Bonnieville Dr., Calera, Alabama 35040.

No objection has been made to any portion of this paragraph. The court will consider it in its entirety.

> 2. I was an employee at the Human Resources Department of Preformed Line Products (PLP) in Alabama. The main office is in Ohio. I handled Briggs & Briggs (Briggs) [sic] account during the time that Alfredo Ameca-Rodriguez (Alfredo) worked there. ~~I knew about Alfredo only because the outrageous circumstances involving the loss of his eye. Alfredo never entered into an employment contract with PLP; he stayed always as Briggs' employee~~.

The defendant objects to the fourth sentence as being based upon information and belief. However, the court does not believe that the sentence is based upon information and belief but instead lays a foundation of the affiant's knowledge of this matter. However, the court does believe that the term "outrageous" is an opinion as well as an improper conclusion and, therefore, finds that it is due to be struck from the sentence. The defendant next objects to the last sentence to the extent it draws a legal conclusion. The court agrees that it is due to be struck. This is an improper conclusion under the circumstances.

> 3. I have voluntarily offered this testimony. I have first hand knowledge of the occurrences involving this case ~~and I wish to express that the acts and omissions of PLP which produced or contributed to the loss of the eye of Alfredo are totally outrageous and contrary to the precepts of any civilized work place~~.

The defendant objects, and the court agrees, that the requested portions of this statement are improper, containing legal conclusions without a factual basis that could be considered, thus they will be struck.

> 4. ~~While grinding metals at PLP a piece of metal entered Alfredo's eye. He reported immediately the incident to a PLP supervisor, Cecil Jones (Jones), but Jones did not make any effort to contact Briggs and sent Alfredo back grinding metals. Alfredo was not allowed to see a doctor until several days later~~.

The defendant objects to the entire paragraph, claiming that it relies on hearsay and/or information and belief. However, the defendant did not question or object to affiant's claim of "first hand knowledge" in the previous paragraph. Therefore, these statements are not due to be struck on that ground.

> 5. ~~The owner of Briggs & Briggs, Bill Briggs, is a very close friend of Dr. Samuel Roberts (Dr. Roberts), the workmens~~ [sic] ~~compensation doctor who sent Alfredo back to work without any restrictions~~.

The defendant objects that the paragraph contains inadmissible and irrelevant opinion testimony, hearsay, and other material based upon information and belief. Without more, the court must agree.

> 6. ~~Alfredo was hired by Briggs, his employment contract was with Briggs, his salary was paid by Briggs, Briggs controlled any salary increase and any benefits, Briggs made state and federal tax withholding, and unemployment withholdings from Alfredo's paycheck. Alfredo's workmens~~ [sic] ~~compensation was paid and exclusively handled by Briggs. PLP did not considered~~ [sic] ~~itself responsible for the workmens~~ [sic] ~~compensation of Alfredo and after Alfredo was injured only Briggs held itself responsible.~~

The defendant objects that the paragraph consists only of legal conclusions. However, the affidavit states that Garzarek was "an employee at the Human Resources Department of Performed Line Products (PLP) in Alabama" and that he "handled Briggs & Briggs (Briggs) [sic] account during that time." (Doc. 15, Ex. 3 at ¶ 2). Thus, it is reasonable to conclude that for purposes of this motion that the affiant has personal knowledge of Ameca's terms of employment with Briggs based on his status as a PLP employee in the Human Resources Department who handled the Briggs account. However, the court will strike the last sentence because Garzarek cannot testify as to what the defendant did or did not consider itself responsible for under the circumstances.

> 7. ~~Alfredo was solely Briggs' employee. Briggs did all the paper work involving Alfredo's employment. There was no employment contract of any type. After an accident PLP was to immediately call Briggs in order to have a physician assigned. Each and every aspect of Alfredo's employment and workmens~~ [sic] ~~compensation were exclusively handled by Briggs~~.

The defendant objects to this paragraph as containing legal conclusions not supported by personal knowledge. The court agrees that much of the paragraph does contain legal conclusions and is due to be struck. However, the court will consider the second sentence that Briggs did all the paperwork. It will also consider the fourth sentence that PLP was to call Briggs after the accident to have a physician assigned. Based on Garzarek's position in the Human Resources department at PLP, it is reasonable to assume that he had personal knowledge of the procedures that were to be followed in the event of an injury. The remainder of the paragraph is due to be struck.

> 8. ~~The facts and circumstances involving Alfredo's relationship with PLP show that only Briggs was Alfredo's employer.~~ Briggs could terminate Alfredo's employment, but PLP had no authority to terminate Alfredo's employment with Briggs.

The defendant objects, and the court agrees, that the first sentence contains improper opinion testimony as to what the facts and circumstances "show." However, the court will not strike the second sentence. Garzarek does have sufficient knowledge based on his position with PLP and his awareness of the Briggs contract to testify as to whether Briggs or PLP could terminate an employee.

> 9. Briggs would send workers to work at PLP under different categories. ~~Administrative jobs were totally different from labor tasks. For administrative jobs one would enter into a contract with PLP, but Alfredo, as a metal grinder, will not even be interviewed by PLP. Alfredo can be fairly classified as an independent contractor performing a task at PLP under the employ~~ [sic] ~~of Briggs~~.

The defendant objects that Garzarek does not have sufficient personal knowledge to testify to the differences between administrative and labor tasks. The defendant claims that his knowledge about administrative jobs being under the contract is "unclear." The court finds ample support for Garzarek's knowledge to allow him to discuss the differences between the administrative and grinder positions. Any purported lack of clarity is a matter for cross examination at trial. The court, however, will strike the specific reference to "Alfredo" and whether he received an interview because it is not evident from the affidavit that Garzarek has first-hand knowledge about Ameca's hiring.[13] Thus, the specific statement is based on information and belief. The court will not strike the statement about the procedures for hiring metal grinders in general because Garzarek has established a sufficient basis to make such an assertion premised on his position with PLP. Finally, the court finds that the last sentence is due to be struck to the extent it suggests there is no training, because it does not appear to be based on personal knowledge.

> 10. ~~After Briggs hired Alfredo he could be sent to any company that Briggs may choose. Alfredo could not take~~ [sic] ~~a decision as to what company he was going to work for. Upon arrival to PLP he is simply told where the grinding area is and starts grinding metals. I have no knowledge that any training is even provided.~~

The defendant objects that Garzarek does not have sufficient knowledge to testify as to the facts stated in this paragraph and therefore the statements are based on information and belief. However, as the court has previously noted, his knowledge of the details of employment practices at Briggs is sufficient because he handled that account. Therefore, the first two sentences will be considered. The last two sentences are different. Nothing therein indicates that

---

[13] To the contrary, his knowledge appears to be precipitated from the events after Ameca's injury.

Garzarek has sufficient knowledge to testify as to what Ameca encountered upon arriving at PLP. To the contrary, the affidavit suggests that he is simply making a general statement about grinders as a group. Therefore, the third and fourth statements will be struck to the extent that they specifically refer to Ameca.

> 11. ~~PLP never treated these Hispanics as its employees nor was PLP interested in treating them in any other way than as Briggs employees. PLP did not want to risk to be exposed to Immigration violations and consequent sanctions, as PLP was well aware that the Hispanics sent by Briggs may be either undocumented or holding fake ID's. PLP used Briggs as an independent contractor to provide Hispanics whether documented or undocumented~~.

The defendant objects, and the court agrees, that this paragraph is due to be struck in its entirety as it contains improper and irrelevant legal conclusions. Affiant cannot testify as to PLP's state of mind or their intentions in using Briggs employees without further foundation.

> 12. ~~At times Briggs exerted control over certain occurrences at PLP related to Hispanics. Following Alfredo's eye accident Briggs exerted its control by choosing some other type of safety glasses for grinders, including Alfredo's, which were all chosen, purchased, and provided by Briggs to the grinders at PLP~~.

The defendant objects, and the court agrees, that the beginning phrase "at times" is an improper generalization and will be struck. The defendant further objects that the remainder of the paragraph is based on information and belief. The court again believes that the affiant does have sufficient personal knowledge due to his position with the defendant and his claim of having "first hand knowledge." (Garzarek at ¶¶ 2 & 3).

> 13. ~~PLP was aware that the grinding area was full of metal dust and a dust collector device would have alleviated the dust and flying metal particles, thus reducing the risk of injury to a person's eyes. PLP refused to purchase the dust collector to save money. PLP had the power to reduce the risk exposure. The unsafe working conditions at the grinding area are obvious~~.

The defendant objects, and the court agrees, that Garzarek is testifying to the defendant's

knowledge and intent. He is precluded from imputing knowledge or awareness on PLP, nor can he testify as to the level of risk or need for a "dust collector" because he has not demonstrated his competence to testify to these matters. Therefore, the paragraph will be struck in its entirety.

> 14. ~~Alfredo and PLP never entered into any contract of hire. Alfredo does not speak English. As a former Human Resources employee at PLP I known~~ [sic] ~~that PLP wanted no employment relationship with Alfredo, and they kept it that way~~.

The defendant objects, and the court agrees, that the first sentence is conclusory. Therefore, it will be struck. As to the second sentence, the defendant asserts that Garzarek can testify that Ameca never spoke English to him, but he may not testify that Ameca did not speak English in general. The court recognizes the fine distinction proposed by counsel but does not find it to be consequential. As to the last sentence, the defendant argues that Garzarek is making assertions as to PLP's state of mind and drawing improper conclusions. The court agrees, but will allow the first portion of the sentence to the extent that it asserts that he worked as a Human Resources employee at PLP.

**Affidavit of Cecil Jones**

The next affidavit was prepared by Cecil Jones, a supervisor for PLP. The defendant makes various general and specific objections which are detailed below.

> 1. My name is Cecil Jones. I am an Industrial Plant Supervisor. I reside at 112 Second Avenue N.E., Alabaster, Alabama 35007.
>
> 2. I worked as a labor Supervisor at Preformed Line Products company (PLP), located at 1909 Hwy 87, Alabaster, Alabama 35007, from 1992. I continue working at the same plant.

No objection has been made to either paragraph. The court will consider them in their entirety.

> 3. As a plant supervisor for PLP I had under my supervision a number of workers including a Hispanic man named Alfredo Ameca-Rodriguez (Alfredo). ~~Alfredo was always very respectful and polite with me and with his co-workers. He performed his work well~~.

The defendant objects, and the court agrees, that the complained-of portions are not relevant under the circumstances and are due to be struck. *See* FED. R. EVID. 401.

> 4. ~~As a supervisor I was all the time pressed by PLP to put people back to work, regardless, after an accident. I was under much pressure from PLP since it was made very clear to me that I could lose my job if I was not following this procedure of putting workers back to work even after they had suffered an injury~~.

The defendant objects that the entire paragraph contains irrelevant information and that the statements are not admissible. However, the defendant also concedes that the statements are admissible "for the limited purpose of establishing Jones' frame of mind." (Doc. 19 at ¶ 4). Therefore, the court will consider the statements only insofar as they establish Jones' frame of mind. The court notes that Jones fails to attribute these conclusions to any particular person at PLP.

> 5. On February 11, 2000, Alfredo was working at the PLP plant under my supervision. His job was to grind metals. ~~That afternoon he reported to me that while grinding metals, a piece of metal entered his eye.~~ I placed some eye drops in his eye, ~~and, following the strict orders of PLP~~, I sent Alfredo back to work. ~~I did not send him to the doctor for the same reason~~.

The defendant objects to portions of this paragraph as inadmissible as proof of the facts asserted therein. (Doc. 19 at 4). It is clear, however, that the objected-to portions are relevant to to show Jones's state of mind and to explain his actions. They are allowed by the court for these limited purposes.

> 6. ~~Fearing to~~ [sic] ~~lose my job, I followed PLP's strict orders, and I did not send Alfredo to the doctor at any time. I was happy to see that later someone intervened for Alfredo so he could be sent to the doctor, but this did not happened~~

[sic] ~~until several days later~~.

The defendant objects to the entire paragraph. First, it asserts that his statement that he was following orders is not supported by any evidence of where those orders came from. Although the defendant is correct that he does not identify who or what those orders were premised upon, the fact remains that Jones was a PLP supervisor and he was responsible for Ameca. Accordingly, the statement is attributable to the defendant because Jones is the agent of the defendant. The second sentence is objected to as irrelevant. The court agrees with these arguments and will strike the second sentence to the extent it describes Jones's feelings.

> 7. I know that later Alfredo lost his left eye. ~~I also know that PLP did not offer any assistance to him~~.

The defendant objects, and the court agrees, that the affiant is not qualified to testify as to the knowledge or actions of PLP on this matter absent more information.

> 8. ~~I know as a fact that the acts and instructions of PLP pressing me to put a worker back to work after the worker had suffered such an injury are totally wrong, unlawful, and contrary to Alfredo's basic human rights, but I was only acting under the orders of PLP. By not following these orders, I could have lost my job~~.

The defendant objects premised on the assertion that this paragraph fails to contain any factual assertions and is due to be struck. The court agrees in part, but allows the same only to the extent it explains the state of mind of Jones.

> 9. ~~PLP has shown no regard for the welfare of its workers. The company was managed by a few owners who were careless as to the needs of the people working there, especially those Hispanics employed by Briggs & Briggs and placed at PLP for temporary work.~~

The defendant objects that this paragraph contains improper opinion testimony. The court agrees.

> 10. ~~The area where metals were ground at PLP was full of metal particles in the air. Some metal pieces fly as metallic dust, but heavier ones may fly as high speed metal bullets~~.

The defendant objects that the affiant is not competent to testify to these matters based on his position as a "labor Supervisor." (Doc. 19 at 6). The court disagrees with the defendant's conclusion. As a "labor Supervisor," Jones stated that he supervised a number of workers including the plaintiff. He can testify about his observations while serving in that capacity.

> 11. ~~The metallic dust is breathed by the workers grinding metals. It is obvious that under such conditions they can develop respiratory problems. The heavier metal particles can injure your eyes. Although the grinders wear safety glasses, they were not safe enough~~.

The defendant objects to the entire paragraph claiming that it contains only general statements of belief and not specific statements of fact. While the court agrees that the majority of the paragraph does contain general statements of belief that are due to be struck, there are a number of factual statements that are premised on Jones's work experience, including that dust is breathed by the workers, the heavier particles can injure your eyes, and the grinders wear safety glasses.

> 12. ~~I believe that the accident that injured Alfredo could have been prevented if PLP had installed a device known as a "dust collector". These devices are quite effective and may absorb as much as 90% or more of the air borne metallic particles~~.

The defendant objects and the court agrees that the paragraph is due to be struck in its entirety as it is conclusory and contains statements for which Jones may not be competent to testify.

> 13. ~~PLP was well aware of the need to install a "dust collector", but the owners did not want to spend the money to purchase it. The price of a dust collector is not much for a company like PLP. I know that PLP was well aware~~

> ~~that installing a "dust collector" was needed to reduce the risk of injury to the workers grinding metals~~.

The defendant objects and the court agrees that the paragraph is due to be struck in its entirety because Jones is testifying as to the knowledge of another, namely the defendant without proper attribution of the same. Also, the final statement is clearly based on information and belief and therefore will be struck. The plaintiff has simply not demonstrated any basis for these statements.

> 14. ~~Temporary workers were used in the metal grinding area because PLP employees did not want to work under those unsafe conditions. The request for a "dust collector" was made, but PLP ignored it. A lot of metallic dust and metal particles were normally in the air of the grinding area, but PLP misrepresented the amounts to avoid the purchase of a "dust collector"~~.

The defendant objects to this paragraph in its entirety based on the affiant's competency to testify to the matters contained within. Jones can testify, based on his experience, as to who worked in his area and what precipitated that fact. The statement regarding a request for a dust collector is a statement of fact, permissible if the affiant has the requisite knowledge. However, that is not determinable from the affidavit. Therefore, it is due to be struck. Additionally, there is no indication of when the request was made. As discussed above, it is reasonable to assume that the affiant, as "labor supervisor," has personal knowledge of the working conditions and is thus capable of testifying that there were metal particles in the air. However, the affidavit does not adequately establish that Jones had the necessary knowledge to testify as to whether PLP misrepresented the amounts of airborne metal particles or to their intent if such a misrepresentation was made. Additionally, there is no reference to who the purported misrepresentations were made.

> 15. ~~I have volunteered this testimony not only in behalf of Alfredo, but in behalf of all the metal grinders at PLP. I was under the pressure of loosing~~ [sic] ~~my job if I did not follow the hard measures of PLP of disregarding injuries and unsafe working conditions. I totally regret not having been able to send Alfredo at once to a good physician to care for his eye~~.

The defendant objects, and the court agrees, that this paragraph will be struck in its entirety because it does not meet the standards set forth in Rule 56(e) of the FEDERAL RULES OF CIVIL PROCEDURE in that it does not set forth "such facts as would be admissible in evidence."

**Affidavit of Deborah Stokes**

The defendant included with its reply to the plaintiffs' response to the motion to dismiss and for summary judgment the affidavit of Deborah Stokes, an administrative assistant with the defendant. (Doc. 16, Ex. A). In the affidavit she detailed the hiring and employment procedures during the relevant time. After her affidavit was filed, the plaintiffs filed another affidavit from Stokes with the plaintiffs' response to the defendant's motions to strike the affidavits of Jones, Diaz, and Garzarek. (Doc. 20). The defendant has moved to strike the legal conclusions in Stokes's affidavit. (Doc. 22). Once again, the court enumerates the contents of the affidavit and the defendant's objections thereto.

> 1. My name is Deborah Stokes. I used to be an administrative assistant for Preformed Line Products (PLP).

No objection has been made to any portion of this paragraph and the court will consider it in its entirety.

> 2. The attorney for PLP, Howard, called me. ~~I told him that Alfredo Ameca Rodriguez (Alfredo) was NOT an employee of PLP. Alfredo was employed by Briggs & Briggs (Briggs)~~.

> 3. I had no power whatsoever to fire Alfredo. I was asked by Howard's runner to sign a paper in blank and no copies of the affidavit were [sic] given to

> me. ~~I want to make~~ [sic] ~~loud and clear again the fact that Alfredo's employer was always Briggs, never PLP~~.

The defendant objects that the affiant is giving her opinion as to Ameca's employer. The defendant cites several legal authorities to support this assertion, including *United States v. Sheffey*, 57 F.3d 1419 (6th Cir. 1995); *Hogan v. American Telephone & Telegraph Co.*, 812 F.2d 409, 411 (8th Cir. 1987) ("opinion testimony is not helpful to the factfinder if it is couched as a legal conclusion"). In *Sheffey*, 57 F.3d at 1424, the trial court allowed certain lay witnesses to answer the question of whether they believed the defendant was driving recklessly and in extreme disregard for human life in a murder and assault case. The defendant argued on appeal that the question called for a legal conclusion and, alternatively, that such an opinion testimony was impermissible because it was not helpful to the jury. The appellate court affirmed the trial court's decision to allow the testimony stating, "The best resolution of this type of problem is to determine whether the terms used by the witness have a separate, distinct, and specialized meaning in the law different from that present in the vernacular. If they do, exclusion is appropriate." *Id.*, 57 F.3d at 1426. In *Hogan*, counsel for the defendant asked witnesses whether they had observed any discriminatory acts by the defendant's supervisors and asked the supervisors whether they had intended to discriminate. *Hogan*, 812 F.2d at 411. The plaintiff objected to these questions on the ground that they called for legal conclusions. The trial court overruled the objections and was affirmed on appeal. The *Sixth Circuit* held as follows:

> A lay witness may give his opinion only if it is based on his perception and is helpful either in understanding his testimony or in determining factual issues. FED. R. EVID. 701. Furthermore, the opinion testimony is to be weighed against the concerns enumerated in FED. R. EVID. 403. *Bohannon v. Pegelow*, 652 F.2d 729, 732 (7th Cir. 1981). All of these considerations are matters peculiarly appropriate for the district court, exercising its discretion, to rule upon. *Id.*;

*Trotter v. Todd*, 719 F.2d 346, 349 (10th Cir. 1983) (qualification of lay witness to give opinion testimony within court's discretion). Opinion testimony that is admissible under these guidelines does not become inadmissible because it addresses an ultimate issue in the case. FED. R. EVID. 704; *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 239 (5th Cir. 1983). *See Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985) (FED. R. EVID. 704 shifts focus from "ultimate issue" to "otherwise admissible"). Consequently, the proper analytical focus in Hogan's appeal is whether the evidence was helpful to the factfinder.

Opinion testimony is not helpful to the factfinder if it is couched as a legal conclusion. *Torres*, 758 F.2d at 150. The requirement of "helpfulness" assures against admitting opinions which would in essence tell the factfinder what result to reach. *Owen*, 698 F.2d at 240 (question asking for legal conclusion supplies factfinder with no information other than what witness believes verdict should be); *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 511 n.17 (2d Cir.), *cert. denied*, 434 U.S. 861, 98 S. Ct. 188, 54 L. Ed. 2d 134 (1977). Because the judge and not a witness is to instruct the factfinder on the applicable principles of law, *Id.* at 509-10, exclusion of opinion testimony is appropriate if the terms used have a separate, distinct, and special legal meaning. *Torres*, 758 F.2d at 151. This is true of the term "discriminate." *Id.* The task of separating questions calling for permissible factual responses from those calling for impermissible legal conclusions is not easy. *Owen*, 698 F.2d at 240.

Any error in overruling these objections was harmless. . . .

*Hogan*, 812 F.2d at 411-12. In *Owen*, the Fifth Circuit Court of Appeals stated:

Fed. R. Evid. 704 abolishes the per se rule against testimony regarding ultimate issues of fact. *United States v. Grote*, 632 F.2d 387, 390 (5th Cir. 1980), *cert. denied*, 454 U.S. 819, 102 S. Ct. 98, 70 L. Ed. 2d 88 (1981); *United States v. Miller*, 600 F.2d 498, 500 (5th Cir.), *cert. denied*, 444 U.S. 955, 100 S. Ct. 434, 62 L. Ed. 2d 327 (1979). The rule provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." The rule was enacted to change the old view that the giving an opinion on an ultimate issue would "usurp the function" or "invade the province" of the jury. As the notes to Rule 704 point out, the traditional view was unduly restrictive, difficult of application, and generally served only to deprive the trier of fact of useful information.

Rule 704, however, does not open the door to all opinions. The Advisory Committee notes make it clear that questions which would merely allow the witness to tell the jury what result to reach are not permitted. Nor is the rule

> intended to allow a witness to give legal conclusions. *United States v. Fogg*, 652 F.2d 551, 557 (5th Cir. 1981), *cert. denied*, 456 U.S. 905, 102 S. Ct. 1751, 72 L. Ed. 2d 162 (1982); *United States v. Milton*, 555 F.2d 1198, 1203 (5th Cir. 1977). *See* McCormick, Evidence § 12 (1972). The task of separating impermissible questions which call for overbroad or legal responses from permissible questions is not a facile one. The example given in the Advisory Committee Notes to Rule 704 is helpful. The question "Did T have capacity to make a will?" should be excluded. The question "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" is permissible. The first question is phrased in such broad terms that it could as readily elicit a legal as well as a fact based response. A direct response, whether it be negative or affirmative, would supply the jury with no information other than the expert's view of how its verdict should read. Moreover, allowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant.

*Owen*, 698 F.2d at 239-40.

The court finds that the second sentence in paragraph "2" (dealing with what Stokes told counsel for PLP) is hearsay and due to be excluded. The third sentence in the same paragraph does assert an opinion by Stokes as to whether or not Ameca was "employed" by the Briggs. In reviewing this conclusion, the court must also review Stokes's prior affidavits submitted by the defendant. (Doc. 21, Ex. 1 (Supplemental Affidavit) & A (Affidavit)). In her earlier affidavits, Stokes states that she worked at PLP at the relevant time as an Administrative Assistant and was acting as a Human Resources Assistant. (Doc. 21, Ex. 1 (Supp. Aff.) at ¶ 2). She was responsible for hiring temporary workers, including Ameca. (*Id.*). She further stated:

> Ameca was an employee of Briggs & Briggs in the sense that I retained him through that agency as a temporary worker to work at PLP. While I did not have the authority to "fire" Ameca from Briggs, I did have the authority to end his work on the premises at PLP, with the approval of his immediate supervisor and the plant manager. PLP did not use the term "fire" when it discontinued the use of temporary workers such as Ameca. Rather, if a temporary worker's performance was unsatisfactory, or his position was no longer needed, PLP told Briggs that his assignment had been "completed."

(*Id.* at ¶ 3). In view of her statements in the affidavit submitted by the defendant, she is in a position to know of his employment capacity. However, the statement is to be read in conjunction with the remainder of her affidavits. Regarding Stokes' last statement that Ameca "always" worked for Briggs, her affidavits do not support such a conclusion and the statement is due to be struck. In sum, the court finds that Stokes' statement is due to be considered by the court only to the extent it is supported by the remainder of the record.

**Affidavit of Alfredo Ameca-Rodriguez**

The defendant next moves to strike the affidavit of the plaintiff. (Doc. 25). The plaintiff has filed a response to the motion. (Doc. 27). In the general objections section of the defendant's motion, it asserts that the affidavit was not timely filed and that it is not adequate under Rule 56 and FEDERAL RULE OF EVIDENCE 604.[14] The affidavit and the specific objections thereto are stated below.

With regard to the general objections, Ameca retorts that the lateness of the affidavit was attributable to the fact that he was in Mexico because of his circumstances and he could not return to the United States until shortly before the affidavit was filed. (Doc. 27 at ¶ 3). The rule is well-established that a moving party may not submit additional evidence with its reply brief, without allowing the nonmoving party an opportunity to respond. The reason for this rule is obvious – the nonmoving party must be allowed at least "a reasonable and meaningful opportunity to challenge a motion for summary judgment." *Burns v. Gadsden State Community College*, 908 F.2d 1512, 1516 (11th Cir. 1990) (*citing*, *inter alia*, *Winbourne v. Eastern Air Lines,*

---

[14] FEDERAL RULE OF EVIDENCE 604 provides, "An interpreter is subject to the provisions of these rules relating to qualification as an expert and the administration of an oath or affirmation to make a true translation." FED. R. EVID. 604.

*Inc.*, 632 F.2d 219 (2nd Cir. 1980) ("purpose of Rule 56(c) is to permit nonmoving party a meaningful opportunity to challenge motion for summary judgment")).

> Recognizing the importance of giving the nonmovant a meaningful opportunity to respond to a motion for summary judgment, this circuit has strictly enforced the requirement of a 10 day advance notice that the court will take a motion for summary judgment under advisement as of a certain date. . . . The reasons for such a requirement are premised on the fact that disposition of a case on summary judgment grounds represents a final adjudication on the merits. It forecloses subsequent litigation on the matter; it is accordingly important that proper notice be given so as to insure "opportunity to present every factual and legal argument available.

*Id.* (internal quotations and citations omitted). Similarly, a nonmovant may not submit evidence after the movant has submitted its reply. However, when faced with additional evidence submitted by the moving party after the time set for the nonmoving party to file all its evidence in opposition to the motion, the court has two options: "it [can] strike the [evidence] or grant [P]laintiff as the nonmoving party the opportunity to respond to it." *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 410 (1st Cir. 1985); *see Beaird v. Seagate Technology, Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998) ("Appellants contend that the district court had no 'permissible choice' but to allow a surreply once it had accepted the materials in Seagate's reply. That contention is incorrect. Having accepted the reply brief, the district court in fact had two permissible courses of action. It could either have permitted a surreply or, in granting summary judgment for the movant, it could have refrained from relying on any new material contained in the reply brief."). Similarly again, the court finds that when a nonmoving party files an affidavit after the deadline, the court has two alternatives. It can consider the same after affording the opposing party an opportunity to respond or it can disregard the new evidence. In the present instance, the parties have all had adequate opportunity to respond to the submissions. The

defendant has filed the present motion to strike that includes specific objections. Accordingly, the court will allow the late affidavit, but will consider each of the defendant's specific objections.

To the extent that the defendant asserts that the affidavit fails to identify the translator or disclose the translator's qualifications, counsel for the plaintiffs asserts that she acted as the translator for the affidavit and that she is fluent in Spanish. (Doc. 27 at ¶ 4). She also asserts that she "reflected the testimony of her client as he requested it to be." (*Id.*). Under these circumstances, the court finds the affidavit sufficient.

The specific provisions of the affidavit and the objections thereto are as follows:

> 1. My name is Alfredo Ameca-Rodriguez. My wife's name is Jules Leyva. I have just arrived in the United States to give testimony related to my employment with Briggs and Briggs, the injury to and subsequent loss of my eye.

No objection has been made to any portion of this paragraph and the court will consider it in its entirety.

> 2. ~~I was expressly hired by Briggs & Briggs, Inc. (Briggs) solely as its employee. I always remained an employee of Briggs, and no changes about my initial employment were ever made, neither expressly nor impliedly.~~

The defendant moves to strike the entire paragraph as an impermissible legal conclusion. Upon consideration, the court finds that the words "expressly" and "solely as its employee" are due to be struck from the first sentence because they invoke improper conclusions. The words "always remained" and "neither expressly nor impliedly" are also due to be struck for similar reasons. Thus, the court will allow the paragraph to the extent it asserts that Ameca was hired by Briggs and there were not changes made after his initial employment.

> 3. ~~I never entered any contract of hire, neither express nor implied, neither~~

> ~~written nor oral involving Preformed Line Products (PLP).~~ My understanding has always been that I was solely an employee of Briggs. I had no reason whatsoever to believe otherwise.

The defendant argues that the first sentence is an improper legal conclusion under the circumstances. The court agrees. It is due to be struck.

> 4. ~~PLP had no decision nor any participation in my being hired by Briggs.~~ I did not even know about PLP at the time.

The defendant objects that the first sentence is ambagious. The court finds that the record does not demonstrate that Ameca has personal knowledge of how the hiring decision was made. Therefore, the first sentence will be struck.

> 5. ~~Only Briggs offered its conditions for employment and salary, and only Briggs handled my paper work~~ [sic].

The defendant moves to strike this paragraph based on a lack of personal knowledge of whether Briggs alone handled plaintiff's paperwork. However, the first portion of the sentence, "Only Briggs offered its conditions for employment and salary," relates directly to the plaintiff's understanding and knowledge of his offer of employment. Since it is based on his personal knowledge, it will not be struck. However, the second portion of the sentence goes beyond the his personal knowledge. Therefore, the second clause of the sentence, referring to the company that handled his paperwork, will be struck.

> 6. PLP was never ~~considered nor~~ held liable for the workmen's compensation provided to me. Only Briggs was held liable for the workmen's compensation. ~~The workmen's compensation doctor was provided by Briggs. For me to go to the doctor PLP would ask Briggs for its permission.~~ My understanding was that if an accident occurred I was to communicate it to a supervisor at PLP so he could call Briggs and request permission.

The defendant argues, and the court agrees, that the objected-to portions of this paragraph

attempt to assert conclusions beyond the personal knowledge of Ameca. The court will strike those portions.

> 7. The safety glasses I was wearing to grind metals were provided to me by Briggs.

No objection has been made to any portion of this paragraph and the court will consider it in its entirety.

> 8. ~~It was clear to me that even if PLP were to become dissatisfied with my work, it was only Briggs who could actually terminate me, replace me or send me to another company. PLP had no power to terminate me because it never hired me. I was always treated as a Briggs employee~~, and that is how I considered myself.

The defendant objects, and the court agrees, that the above-marked portions of this paragraph are based on a lack of knowledge by the affiant and contain statements which draw impermissible legal conclusions. However, the last sentence establishes the plaintiff's state of mind and therefore will be considered by the court to the extent relevant.

> 9. ~~I never had to explain anything to PLP or report anything to PLP.~~ If I had been unhappy with the work I was performing, I would have reported it only to Briggs.

The defendant objects to the first sentence of this paragraph, asserting that it directly conflicts with a prior statement that "if an accident occurred I was to communicate it to a supervisor at PLP." (Ameca Affidavit at ¶ 6). However, these two statements are not so contradictory that they must be struck.[15] The sentence in paragraph six relates directly to the procedure to be followed when an accident occurred. The court reads the first sentence in

---

[15] In *Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656 (11th Cir. 1984), the court stated that "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Id.* at 657. In *Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1986), the court stated that a lower court should be cautious in rejecting the contents of an affidavit even if it is at odds with earlier statements.

paragraph nine to merely be an assertion that he did not have to explain or report anything to PLP while he was working there. Therefore, the court will not strike any portion of this paragraph.

> 10. My salary checks ~~came directly from and~~ bear [sic] solely the name of Briggs. I only knew Briggs as the employer paying my salary; ~~I received no money from PLP. Briggs did all the accounting for my hours and the deductions for taxes and unemployment benefits.~~

The defendant objects to a portion of the first sentence, claiming, "Ameca knows very well that PLP, and not Briggs, distributed his paychecks." (Doc. 25 at 7). The court sees two problems with this argument. First, Ameca's statement does not deny that his paychecks were distributed by PLP. It only states that the paychecks came from Briggs. It, therefore, will not be struck. Furthermore, the defendant's main objection purports to define what the affiant did or did not know. This is argumentative and therefore is not a proper basis for striking the statement. In the second sentence, the defendant has struck through the portion that provides that Ameca received no money from PLP. The motion is due to be denied as to this objection as the statement is based on his personal knowledge. However, the last sentence will be struck because Ameca has not demonstrated that he has the requisite personal knowledge to support the conclusions asserted.

> 11. When I first injured my eye PLP did nothing for me; ~~they did not call my employer Briggs~~, but instead, the supervisor, Cecil Jones, put me back to work grinding metals ~~even while knowing that a piece of metal was embedded in my eye and that I was suffering much pain.~~

The defendant objects, and the court agrees, that Ameca has not demonstrated sufficient personal knowledge of the communications that occurred between PLP and Briggs to allow the statement. Additionally, Ameca cannot testify about what, if any, knowledge PLP or Cecil Jones had regarding the extent of his injury. However, the court does note that the affidavit of Jones

demonstrates his knowledge of Ameca's problem with his eye. There is no indication in Jones's statement that he knew that "embedded in my eye and that I was suffering much pain

> 12. Because I had no money to purchase pain medication, the interpreter, Mayra Diaz, purchased some medicines for me. ~~She was sometime later reimbursed by my employer Briggs, and not by PLP.~~

The defendant objects, and the court agrees, that the second sentence of this paragraph appears to be based on information and belief or hearsay. Therefore, it will be struck. The court does note that Diaz has already offered testimony regarding this matter.

> 13. When Briggs send [sic] me to PLP to grind metals I had no training from PLP; I was just send [sic] to a grinding area to work with other ~~Briggs'~~ grinders, ~~but not with PLP employees.~~ ~~It was totally clear to me that working on the PLP premises was like~~ [sic] ~~in an independent contractor relationship.~~

The defendant objects, and the court agrees, that these statements offer improper opinions not only about Ameca's employment status, but also the employment status of other workers at PLP. There is an insufficient foundation provided by the affidavit to support such statements. They will be struck.

> 14. ~~The area where I was grinding metals had metal particles in the air resulting from the grinding of several people there.~~ I went to complain about this to Briggs and not to PLP. There was no dust collector ~~and this created a dangerous condition for me and the rest of the grinders.~~ ~~I had respiratory problems which ceased when I was no longer exposed to the metal dust.~~ I went to complaint [sic] about this to Briggs and not to PLP because I considered Briggs to be my employer.

The defendant objects to the first sentence of this paragraph as an inappropriate statement for a Rule 56(e) affidavit because it is based upon information and belief. The court does not agree with this assertion, however, because the affiant worked within the conditions testified to and has demonstrated adequate personal knowledge. Also, nothing in the defendant's objection

leads the court to believe that the statement could not be properly introduced into evidence as the plaintiff's own personal observation of the work environment. However, the objected-to portions of the third sentence (regarding a "dangerous condition") is due to be struck as improper opinion evidence that requires specialized knowledge that has not been demonstrated. The fourth sentence, discussing the effects of the work environment upon his respiratory system, is allowable.

- SUMMATION: ~~Only Briggs employed me to perform services for hire and paid my wages directly to me. I never entered into any contract of hire with PLP. I was never informed nor did I consented~~ [sic] ~~to be an employee of PLP. I even disliked to be at PLP because the working conditions were unsatisfactory and not being its employee I was not treated well. My belief has been always that Briggs alone was my employer and only Briggs could terminate my employment.~~

The defendant moves to strike this entire paragraph as containing self-serving legal conclusions. It argues that whether Ameca consented to be an employee of PLP must be decided by the court. While this is a correct understanding of the law, it does not prevent Ameca from testifying as to his personal knowledge of certain matters. However, to the extent he asserts legal conclusions the affidavit is due to be struck. Additionally, his conclusory comments, including that he did not like working at PLP, are irrelevant.

**"Untimely and Unauthenticated Evidentiary Materials"**

The defendant next moves to strike certain documentary items submitted by the plaintiffs in their "Third Notice of Filing Additional Evidentiary Materials" that were submitted after the court's scheduling deadlines passed. (Doc. 30). The plaintiffs have not filed any response to the motion. The objected-to documents are a letter from the defendant's counsel after the worker's compensation claim was filed (ex. 6), a fax from Ophthalmology Associates to Bill Briggs

regarding Ameca (ex. 7), and a patient registration and financial agreement concerning Ameca (ex. 8). (Doc. 28).

Absent any explanation for the late filing, the court finds that the motion is due to be granted and the documents struck. Accordingly, they will not be considered in resolving the present motion to dismiss and for summary judgment.

**SUMMARY JUDGMENT STANDARD**

Because the parties have submitted various affidavits and documents in support of their respective positions, the court will consider the present motion as one requesting summary judgment.

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex,* 477 U.S. at

322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259; *see Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983). *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 643 (11th Cir. 1997). However, the nonmoving party "must do more than simply show that there is some

metaphysical doubt as to the material facts." *Matusushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson,* 477 U.S. at 254; *Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only the benefit of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Allen*, 121 F.3d at 643.

**DISCUSSION**

*Exclusivity Arguments*

The defendant initially argues that the exclusivity provisions of the Alabama Workers' Compensation Act bar all of Ameca's claims. (Doc. 13 at 3). The Alabama Workers' Compensation Act provides in pertinent part:

> [N]o employer shall be held civilly liable for personal injury to or death of the *employer's employee* . . . whose injury or death is due to an accident or to an occupational disease while engaged in the service or business of the employer, the

cause of which accident or occupational disease originates in the employment. . . .

ALA. CODE § 25-5-53 (2000); *see also Ex parte State Dept. of Indus. Relations*, ___ So. 2d ___, 2002 WL 844753, *2 (Ala. May 3, 2002) ("The recovery of benefits by dependents following the death of an employee caused by a work-related injury is governed by § 25-5-60, Ala. Code 1975."). The defendant further argues that under Alabama law "an employee hired through a placement or temporary agency is an employee, for worker's compensation purposes, of '***both*** his or her ***general employer*** (i.e., the employment agency) and his or her *special employer* (i.e., the employer to which the employment agency assigned the employee to work[)].'" (Doc. 13 at 3 (*quoting Marlow v. Mid South Tool Co.*, 535 So. 2d 120, 123 (Ala. 1988)) (emphasis in original).

The Alabama Supreme Court considered this issue in *Terry v. Read Steel Products*, 430 So. 2d 862 (Ala. 1983). Therein, the plaintiff worked for Read Steel after being placed there by Manpower, Inc., an employment agency that provided Read with temporary laborers. He was injured when his hand was caught in a machine he was operating at Read. He sought and received workman's compensation benefits from Manpower and then brought suit against Read. Read filed a motion for summary judgment, asserting that it was immune from suit under the workman's compensation laws. The trial court granted the motion. On appeal to the Alabama Supreme Court, the trial court was affirmed. The Supreme Court adopted a test to determine whether an employee from a temporary or placement agency was also an employee of the company he was assigned to work in. The court stated as follows:

> "When a general employer lends an employee to a special employer, the special employer becomes liable for workmen's compensation [and therefore exempt from civil liability] only if
>
> (a) the employee has made a contract of hire, express or implied, with the

special employer;

(b) the work being done is essential that of the special employer; and

(c) the special employer has the right to control the details of the work.

"When all three of the above conditions are satisfied in relation to both employers, both employers are liable for workmen's compensation . . . ."

*Terry*, 430 So. 2d at 865 (*quoting* 1C A. Larson, *The Law of Workmen's Compensation*, § 48 (1980)). The *Terry* court found the requirement that there be a contract of hire, either express or implied, between the employee and the employer the most important factor. *Terry*, 430 So. 2d at 866. Analyzing the facts, the court noted that Terry had not gone to the temporary placement agency, but instead was hired directly by the defendant, the special employer, and only was paid by the placement agency. *Id.* Under these facts, the court held that Terry was a Read employee for worker's compensation purposes. *Id.*

Two years after *Terry*, the Alabama Supreme Court was again faced with a similar question in *Pettaway v. Mobile Paint Manufacturing Co., Inc.*, 467 So. 2d 228 (Ala. 1985). Pettaway was burned severely by an explosion on the premises of Mobile Paint after he was placed there by Manpower, Inc. Approximately three months before Pettaway suffered his injuries, he had gone to Manpower, and filled out an application in an effort to obtain work. During the intervening three months, he had returned to Manpower several times to receive work assignments. Manpower sent him to different job sites for the purpose of providing temporary labor. Approximately two weeks before his injury, Manpower informed Pettaway of an available work assignment at Mobile Paint. Pursuant to the normal procedure, Manpower asked Pettaway if he would accept such an assignment. Pettaway agreed to do so. Pettaway stopped by Manpower to pick up a time sheet. He then went to the Mobile plant and performed ordinary

labor. He went to Manpower at the end of each week to get a new time sheet and receive a pay check. He was paid $3.75 an hour by Manpower, which in turn charged Mobile Paint $5.34 an hour for his services. A portion of the difference was used by Manpower to purchase Workmen's Compensation insurance. Pettaway's work was directed and supervised exclusively by Mobile Paint, with the exception that written permission from Manpower was necessary before he could handle vehicles or machinery. Pettaway and his wife filed suit against Mobile Paint and others, alleging negligence and breach of contract. The trial court granted the motion for summary judgment filed by Mobile Paint. On appeal, the Alabama Supreme Court stated that the single question was whether Mobile Paint was immune from suit. Affirming the trial court, the Supreme Court stated as follow:

> The dispositive facts of this case are indistinguishable from those presented in *Terry v. Read Steel Products*, 430 So. 2d 862 (Ala. 1983). In *Read Steel*, this court upheld a summary judgment entered in favor of the defendant, Read Steel, on the basis that Read Steel was immune from suit as an employer under the Workmen's Compensation Act. *Read Steel*, as does this case, involved a situation where a general employer (Manpower, Inc.) merely provided laborers to special employers and then performed clerical tasks for the special employer. This court noted that in such a situation, the dispositive test to be applied is whether a contract of hire existed between the special employer and the employee, in this case Mobile Paint and Jonas Pettaway. After reviewing the entire record we find that: (1) An implied contract of hire existed between Pettaway and Mobile Paint; (2) Pettaway's work was essentially that of Mobile Paint; (3) Mobile Paint had the right to control the details of the work. Accordingly, Mobile Paint is immune from civil liability for the injuries suffered by Pettaway. *Terry v. Read Steel Products*, 430 So. 2d 862 (Ala. 1983); Code 1975, § 25-5-53.

In *Tweedy v. Tennessee Valley Authority*, 882 F.2d 477, 480 (11th Cir. 1989), the Eleventh Circuit was presented with the question of whether Tweedy, who was injured at a Tennessee Valley Authority ("TVA") facility, was precluded from suing the TVA due to the fact that it was a special employer. The facts showed that

> . . . Gilbert/Commonwealth, Inc. ("Gilbert") entered into a staff augmentation contract wherein it agreed to provide "personnel to perform general engineering . . . services related to TVA's nuclear . . . power plants in accordance with criteria, procedures, and scheduling requirements established by [TVA]." Under the contract Gilbert was to provide personnel to work under TVA's supervision to supplement TVA's regular engineering staff at the Browns Ferry Nuclear Plant ("BFNP").
>
> The contract also provided: (1) All Gilbert employees performing work on TVA's premises must meet citizenship requirements, undergo a medical examination, and submit to a security investigation identical to that of regular employees; (2) TVA promised (a) to reimburse Gilbert for the wages it paid to employees providing services to TVA and (b) to pay a fixed percentage of these wages for overhead expenses; (3) Gilbert promised to provide for worker's compensation insurance out of the money it received from TVA; and, finally, (4) TVA reserved the right to control the work performed by Gilbert supplied workers. . . .
>
> Tweedy applied for work at BFNP in the field engineering section in December, 1986. Initially, two TVA managers interviewed Tweedy and then referred him to Gilbert for employment. Thereafter he was processed through TVA's personnel, health physics, medical and other offices, and attended its training classes (including courses in industrial safety requirements for entering nuclear contaminated zones). Tweedy then began working as an engineering aide, on Gilbert's payroll, but under the supervision of TVA employees.

After discussing the holdings in *Terry* and *Pettaway*, the court stated that

> . . . in *Marlow v. Mid South Tool Co.*, 535 So. 2d 120 (Ala. 1988), the court held that Mid South was a special employer when the injured employee was obtained from the temporary agency, Kelly Services.[[16]]
>
> The fourth case, and the only one not involving a temporary agency is *Bechtel v. Crown Central Petroleum Corp.*, 495 So. 2d 1052 (Ala. 1986). There Crown entered into a personnel supply contract with Pep Services, Inc. (Pep), which undertook to supply Crown with personnel to operate retail service stations. *Id.* at 1054. The contract obligated Crown to pay the employee's wages, worker's compensation insurance, social security contributions, as well as a service charge.

---

[16] In *Marlow*, the plaintiff applied for employment with Kelly by filling out an application and taking a dexterity test, which was part of an arrangement between Kelly and the defendant-employer Mid South. *Marlow*, 535 So. 2d at 121-22. The plaintiff was hired the next day and reported directly to Mid South where she was trained and her time card was located. *Id.* at 122. She was supervised on-site by a Mid South foreman. *Id.* Mid South had the ability to request that any unsatisfactory worker be removed by Kelly from the assignment. *Id.*

> Bechtel, the plaintiff worker, was hired by Pep and assigned to work at one of Crown's gas stations where he slipped and fell while working. After receiving payment under the Alabama Workmen's Compensation Act, Bechtel sought a tort recovery against Crown. The trial court granted summary judgment in favor of Crown holding that, as a special employer, Bechtel's suit against it was barred. *See id.* at 1053-54. The Alabama Supreme Court upheld the trial court's decision and relied on the following facts: (1) Bechtel was under the supervision of a Crown employee; (2) Bechtel wore uniforms supplied by Crown; (3) Crown participated in the hiring process; (4) a Crown employee signed Bechtel's time sheets; and (5) a Crown employee had authority to terminate Bechtel's employment. *Id.* at 1054.

*Tweedy*, 882 F.2d at 480 (footnote added). Affirming the trial court's dismissal of the action, the court stated:

> . . . . First, we note that the contract between Gilbert and TVA clearly provides: "All work done by Contractor hereunder shall be reviewed by TVA and subject to TVA approval. TVA shall retain overall responsibility for the technical adequacy of the work when such work is performed under TVA supervision." Second, while Tweedy's affidavits suggest that Gilbert employees worked in Tweedy's area and exercised limited supervisory functions over his work, substantial evidence eliminates any genuine dispute concerning Tweedy's submission to the control and supervision of his TVA supervisor, Presley. Tweedy received his day-to-day assignments from Presley. Further, to the extent that any Gilbert co-workers may have exercised any limited supervisory authority over Tweedy, this was done only at the behest of Presley. The "control" that the "special employer" must assume need not extend to the technical details of a skilled employee's activity. To hold otherwise would tend to strip skilled employees of the protection of workmen's compensation acts. *See* 1C A. Larson, *supra*, § 48.30 at 8-502. Additionally, TVA had the responsibility for training Tweedy and designating his work schedule. TVA furnished Tweedy with all the equipment needed to perform his job, including his uniform. TVA had the right to fire Tweedy. The control necessary to invoke the "special employer" doctrine has been demonstrated by evidence not subject to genuine dispute.

*Tweedy*, 882 F.2d at 480.

In *Hicks v. Alabama Power Co.*, 623 So. 2d 1050 (Ala. 1993), the court distinguished between temporary employment agencies and labor brokers and stated that when a person applied

to a temporary employment agency

> it was not for the purpose of entering into employment with those companies to do the work of those companies; rather the plaintiffs intended for the general employers to 'market' them to secure employment with another, special employer. Once those plaintiffs were presented by the employment services to the special employers, those plaintiffs then entered into a contract of hire with those special employers.

*Hicks*, 623 So. 2d at 1055. The plaintiff in *Hicks* presented evidence that he had been sent by his union to a placement agency which performed construction services for the defendant. *Id.* The plaintiff also presented evidence that the placement agency had paid his workers' compensation and medical benefits and that his paychecks came from the placement agency. *Id.* The court held that the defendant had not produced evidence to show that the plaintiff consented to new employment with them. *Id.* Since the plaintiff had submitted substantial evidence which was in dispute, his consent could not be implied. *Id.* The court also reviewed cases from other jurisdictions, including *Crain v. Webster Electric Coop.*, 568 S.W.2d 781 (Mo. App. 1978) (holding that consent to a special employment relationship "cannot be inferred merely from the fact that the employee obeyed the commands of his master in entering the services of another;" the employee's consent must be express, "informed and deliberate," to create an implied contract of hire with the alleged special employer); *Latham v. Technar, Inc.*, 390 F. Supp. 1031, 1039 (E.D. Tenn. 1974) (holding that the plaintiff must have knowledge of, and must consent to, a special employment relationship; the mere fact that her activities may have been controlled by the new master is not sufficient to create a new relationship in the absence of an express or implied contract); *Clark v. Luther McGill, Inc.*, 127 So. 2d 858, 862 (Miss. 1961) (holding that the employee must consent to become the employee of the purported special employer before a

contract of hire may be implied); *Selid Construction Co. v. Guarantee Ins. Co.*, 355 P.2d 389, 393 (Alaska 1960) (holding that consent of an employee to a change in employers cannot be implied merely from his obedience to the orders of his master to serve another). *Hicks*, 623 So. 2d at 1055-56. The court then held that whether the plaintiff had consented to be an employee of the defendant was a question of fact and affirmed the denial of the motion for summary judgment. *Id.*

In *Gaut v. Medrano*, 630 So. 2d 362 (Ala. 1993), the Alabama Supreme Court again looked at the issue of whether an employee of a general employer who went to work for another company became the employee of the special employer for purposes of determining the application of the exclusivity provisions under the Alabama Workers' Compensation Act. The court defined special employers as "'individuals or businesses who, for practical purposes, may be considered primary or co-employers of the injured employee.'" *Gaut*, 630 So. 2d at 364 (quoting *Rhodes v. Alabama Power Co.*, 599 So. 2d 27, 28 (Ala. 1992), *Tweedy*, 882 F.2d at 479). The court further defined an employee as a "'person in the service of another under any contract of hire, express or implied, oral or written.'" *Gaut*, 630 So. 2d at 364 (*quoting* Ala. Code § 25-5-1(5) (1975)). The plaintiff in *Gaut* had been hired by an employment agency and sent to the defendant's workplace to provide general labor on a temporary or as needed basis. *Gaut*, 630 So. 2d at 363. The money the defendant paid the employment agency included a fee for the laborers working on their premises which covered payroll; taxes; insurance, including worker's compensation benefits; overhead; and a profit. *Id.* After the plaintiff had been injured and brought suit, the defendant argued that the Alabama Workers' Compensation Act barred any civil action because, under the *Terry* test, the plaintiff had become an employee of the special

employer-defendant. *Id.* at 363-64. The court explained that in order for the plaintiff to have become an employee of the special employer-defendant, there must have been a contract of hire, either express or implied, between the plaintiff and defendant. *Id.* at 365. It stated, "This is an important determination, for when a person enters into an employer-employee relationship with a party, that person gives up valuable rights, including the common law right to bring an action against the party for any injury he might suffer while acting in the scope of his employment." *Id.* Quoting Professor Larson, the court wrote:

> In compensation law, the spotlight must . . . be turned upon the employee, for the first question of all is: Did he make a contract of hire with the special employer? If this question cannot be answered "yes," the investigation is closed, and there is no need to go on into tests of relative control and the like.
>
> This must necessarily be so, since the employee loses certain rights along with those he gains when he strikes up a new employment relation. Most important of all, he loses the right to sue the special employer at common law for negligence; and when the question has been presented in this form, the courts have usually been vigilant in insisting upon a showing of a deliberate and informed consent by the employee before employment relation will be held a bar to common-law suit.

*Gaut*, 630 So. 2d at 365 (*quoting* 1C A. Larson, *The Law of Workmen's Compensation*, § 48 (1980)). The court distinguished between labor brokers and temporary employment agencies in the same way the court had in *Hicks*, reemphasizing that an employee "who applies to the general employer for the specific purpose of temporary placement with special employers . . . necessarily agrees to a contract of hire with the special employer." *Gaut*, 630 So. 2d at 366. The court also recognized the difference when dealing with a labor broker because "it may or may not be obvious to an employee that the nature of his employment with one employer is such that he is impliedly agreeing to a contract of hire with another entity operating as a 'special employer.'"

*Id.* at 367. The court then looked at various factors of the employment at issue to determine whether the plaintiff had entered into a contract of hire with the defendant, including who provided the clothes and safety equipment necessary for the work, who supplied his work tools, who managed the administrative details of his employment, whether the defendant had a right to terminate the plaintiff for unsatisfactory work performance, how long the general employer had been providing employees to the special employer, and how long the employee worked for the defendant employer. *Id.* at 366-67.

The *Gaut* court found that the general employer handled all of the details of the plaintiff's work and provided all of his tools and safety equipment, but the special employer-defendant retained the right to terminate the plaintiff if his work had been unsatisfactory. *Id.* Under these facts, the court held that whether the plaintiff had become an employee for workers' compensation purposes of the special employer-defendant and whether there had been an implied contract of hire was a question of fact for the fact finder.

With the foregoing framework in place, the court must now examine the facts before it to determine whether the defendant has met the requisite standard on this motion to dismiss or for summary judgement.

Ameca stated in his affidavit that he had been hired by Briggs and believed that he had remained a Briggs employee even while working at PLP. (Ameca at ¶¶ 2, 3, 8, and 9). Ameca also stated that his paychecks bore the name of Briggs, that Briggs had provided his benefits, including workers' compensation insurance, and that Briggs supplied his safety equipment. (*Id.* at ¶¶ 6, 7, and 10; Garzarek at ¶ 6; Diaz at ¶ 3).

Stokes and Garzarek, PLP employees, stated in their affidavits that PLP did not have the

authority to fire Ameca. (Stokes Supp. Aff. at ¶ 3; Affidavit of Garzarek at ¶ 8). Stokes stated that she "did have the authority to end his work on the premises at PLP, with the approval of his immediate supervisor and the plant manager. PLP did not use the term 'fire' when it discontinued the use of temporary workers such as Ameca. Rather, if a temporary worker's performance was unsatisfactory, or his position was no longer needed, PLP told Briggs that his assignment had been 'completed.'" (Stokes Aff. at ¶ 2 (Doc. 21, Ex. 1)). She also stated, however, that PLP determined who would be hired, what work they would perform, what shifts they would be assigned, the number of hours and the scheduled breaks. (Stokes Aff. at ¶ 3). Garzarek stated that Briggs could send Ameca to whatever company it chose. (Garzarek at ¶ 10).

Weber states in his affidavit that the plaintiff was retained by PLP through Briggs, an employee leasing firm, and that PLP paid Briggs the plaintiff's salary and a premium for its services and for workers' compensation insurance for the plaintiff. (Weber Aff. at ¶ 4). PLP also scheduled the plaintiff's shifts and hours, assigned his tasks, provided him with tools and equipment, coordinated the work, enforced safety regulations and inspected the finished product. (*Id.* at ¶ 5).

Under the test developed in *Terry*, PLP must show that Ameca made a contract of hire, either express or implied, with it; that the work he did was essentially that of PLP; and, that PLP had the right to control the details of his work. The last two elements of this test are easily satisfied. Ameca's work at PLP involved grinding metals for PLP to use in its manufacturing process. Additionally, since Jones, a PLP employee, supervised Ameca's work, it can be reasonably inferred that PLP had the right to control the details of Ameca's work. However, because it is disputed whether PLP had the right to terminate Ameca, it could be argued that

there is some question as to whether PLP did indeed have the right to control all the details of his work. As best this court can discern from Stokes's affidavit, PLP had the right to "end" Ameca's work at PLP while Briggs had the right to terminate his employment if his work was deemed unsatisfactory or his services were no longer needed. (Doc. 21, Ex. 1 at ¶ 3). The court finds that this is sufficient to meet the control requirements of the third element for purposes of the present matter.

The most difficult issue to be determined is whether Ameca made a contract of hire with PLP. There has been no evidence by either of the parties that Ameca entered into an express contract of hire. Therefore, the court must determine whether Ameca and PLP had an implied contract based on the circumstances. It appears from the record that Briggs is an employee leasing firm,[17] but whether that means it acted as a temporary employment agency or as a labor broker is unclear. If Briggs acted as a temporary employment agency, the court could begin with the premise recognized above that an employee of such an agency would have understood that when he or she applied for work, he or she would be entering into an implied contract of hire with the special employer. However, if Briggs acted as a labor broker, then under *Gaut*, Ameca's implied knowledge of a contract of hire is more questionable.

In examining the issues, the court finds the factors developed in *Gaut* and articulated elsewhere to be helpful.[18] These factors include (1) the hiring practices involved, (2) who

---

[17] *See* Weber Aff. at ¶ 4.

[18] The court notes that the decisions in *Hicks* and *Gaut* are not controlling because they are factually and legally distinguishable. In *Hicks*, summary judgment was precluded because the evidence, including the contract and labor agreement between the general employer and the defendant did not support the inference that there was an implied contract between the plaintiff and the defendant. The contract specifically stated that the plaintiff was not an employee of the defendant. Under the circumstances, the court found that it was sufficiently in dispute as to whether the defendant was a special employer so as to preclude the granting of summary judgment. In *Gaut*, summary judgment was inappropriate because there were factual disputes regarding the defendant's status as a special employer. For instance, there was evidence that the plaintiff did not wear clothing of

supplied the work clothes and safety equipment required for the work, (3) who supplied his work tools, (4) who managed the daily activities of the plaintiff, (5) who handled the administrative details, including, time keeping, payroll records, issuing checks, workmans' compensation and insurance, (6) whether the defendant had a right to terminate the plaintiff for unsatisfactory work performance, (7) how long the plaintiff worked for the general employer, (8) how long the plaintiff worked at the defendant's facility.

As to the first factor, the hiring practices, there has been no evidence presented by either party concerning what involvement, if any, the defendant had in the hiring of Ameca by Briggs. In fact, there is no evidence presented concerning Briggs's hiring practices.

As to the second factor, work clothes and safety equipment, so far as the court can tell, neither Briggs nor PLP provided Ameca with any clothing necessary for his work. Briggs did supply its employees with the safety glasses they used while grinding metal for PLP.

As to the third factor, work tools, it is evident that PLP supplied Ameca's work tools and the machinery he used to grind metal. There is no evidence to the contrary.

As to the fourth factor, management of the plaintiff's daily activities, the evidence shows that PLP directed Ameca's work assignments and breaks. There is no evidence before the court that Briggs had any supervisors on site at the defendant's facility or that PLP had to contact Briggs before changing his assignments or hours.

As to the fifth factor, the administrative details, it appears that Briggs handled most of

---

the special employer; he wore a hardhat bearing the name of the general employer; the special employer did not participate in the hiring process; and the general employer handled the administrative details of the plaintiff's employment; and, the special employer could "replace" the plaintiff, but it was unclear whether that also meant that the plaintiff would be "fired" by the general employer.

The court further notes that while *Terry*, *Pettaway*, *Marlow*, and *Bechtel* state controlling principles that the court must apply, the facts herein, as examined below, are insufficient to support the granting of the motion for summary judgment.

those matters concerning Ameca's employment. Briggs determined his salary, handled the paperwork concerning his employment, prepared his paychecks on Briggs's account, and provided Ameca with health insurance and worker's compensation insurance. PLP also refused to reimburse Diaz for the $17.71 she paid for Ameca's medicine. She was reimbursed by Briggs.

As to the sixth factor, rights of termination, PLP has not established for purposes of this motion that it had the power to terminate Ameca's employment if his work had been unsatisfactory. To the contrary, the record demonstrates that if his work was not satisfactory, the defendant would inform Briggs that his assignment had been completed. (Stokes Supp. Aff. at ¶ 3).

As to the seventh factor, the plaintiff's longevity with the general employer, there is no evidence showing how long Ameca worked with Briggs. There is no evidence concerning any other assignments Ameca may have had with Briggs.

As to the eighth factor, the plaintiff's stint at the defendant's facility, there is no evidence how long Ameca was with the defendant before his injury. There is no evidence as to whether he performed any other jobs or assignments while at PLP.

Under the foregoing circumstances, the court does not find that the record is sufficient to grant the defendant's motion to dismiss or for summary judgment. The evidence clearly demonstrates that there are genuine issues of material fact about whether Ameca and PLP entered into an implied contract of hire and whether Briggs acted as a temporary employment agency or as a labor broker. As the court in *Gaut* noted, whether the parties entered into a contract is an important determination because the employee gives up his or her right to sue at common law for injuries suffered while acting in the scope of the employment. Courts, therefore, must be vigilant

in requiring a showing of "deliberate and informed" consent by the employee. Because the parties have raised genuine issues of material fact, this court cannot conclude at this juncture as a matter of law that the parties entered into a contract of hire which would preclude Ameca's claims against PLP. To find that there was an implied contract of hire would require the court to delve into speculation, something it cannot do.[19]

**Outrage and Intentional Infliction of Emotional Distress[20]**

In *American Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1981), the Alabama Supreme Court first recognized, defined, and created liability for the tort of outrage, which previously had not accepted or rejected. The court recognized that the tort of outrage had slow acceptance because of fear that fictitious or trivial claims might be brought with questionable proof, and because of the difficulty in setting up satisfactory boundaries to liability. *Inmon*, 394 So. 2d at 364. Based on these concerns, the court limited its application, stating that the tort "applies only to unprivileged, intentional or reckless conduct of an extreme and outrageous nature, and only that which cases severe emotional distress." *Id.* at 365. *Accord Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1319 (N.D. Ala. 2002) ("[T]he Supreme Court of Alabama has restricted the confines of this tort, allowing for recovery 'only in the most egregious circumstances.' *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993).")

---

[19] As a part of its argument that the plaintiffs' claims are precluded by the Workers' Compensation Act, the defendant asserts that the facts alleged are insufficient to state a claim for loss of consortium because Leyva left the United States when Ameca was no longer able to support her and he is able to return to Mexico any time he desires. (Doc. 13, at 5). The defendant cites no authority in support of this position. A loss of consortium claim involves much more than is suggested by the defendant's motion. The court finds that the defendant's motion is due to be denied on this ground as well.

[20] "[T]he torts of outrage and intentional infliction of emotional distress are one and the same under Alabama law. *See, e.g., Stewart v. Matthews Indus., Inc.*, 644 So. 2d 915, 918 (Ala. 1994); *see also Ex Parte Jackson*, 485 So. 2d 1116 (Ala. 1986)." *Wiggins v. Risk Enterprise Management Ltd.*, 14 F. Supp. 2d 1279, 1283 (M.D. Ala. 1998).

The Alabama Supreme Court defined outrage as

> willful wrongs, or those made so recklessly as to equate willfulness, authorize recovery in damages for the mental suffering caused thereby, and we now recognize that one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress. The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. [Citation omitted]. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

*Id.* The court in *Inmon* also stated that "it should be sufficient to observe that an employer, by virtue of his position, possesses no roving license to treat his employee in an extreme and outrageous manner, whether before, during or after their relationship." *Id.*, 394 So. 2d at 364.

In *Ex Parte Crawford*, 693 So. 2d 458, 460 (1997), the court, referring back to *Inmon*, set out the elements of the tort of outrage. "The plaintiff must prove (1) that the defendant's conduct was intentional or reckless; (2) that it was extreme and outrageous; and (3) that it caused emotional distress so severe that no reasonable person could be expected to endure it." *Crawford*, 693 So. 2d at 460. "[A]fter citing more than twenty cases where a tort of outrage claim was not actionable, the court in *Thomas* outlined three limited circumstances where Alabama courts have allowed this claim to go to the jury: (1) cases having to do with wrongful conduct in the context of family burials . . . ; (2) a case where insurance agents employed heavy-handed barbaric means in attempting to coerce the insured into settling an insurance claim . . . ; and (3) a case involving egregious sexual harassment. . . . *Whaley v. Sony Magnetic Products, Inc. of America*, 894 F. Supp. 1517, 1525 (M.D. Ala. 1995). Whether conduct rises to the level sufficient to support a claim of outrage 'may be made by the trial court as a matter of

law.' *Logan v. Sears, Roebuck & Co.*, 466 So. 2d 121, 123 (Ala. 1985)." *Thrasher*, 195 F. Supp. 2d at 1319.

PLP argues that Ameca cannot prove an improper motive in PLP's treatment of him after his accident. (Doc. 13, p. 6). Ameca alleges that PLP's actions were intentional or reckless, and extreme and outrageous. Ameca claims that he was forced to continue working after the accident occurred and that PLP refused to give him leave to go and seek medical treatment. (Doc. 15, p. 10). During this time, Ameca claims that he suffered "excruciating" pain, severe headaches, and fainting spells. (*Id.* at 8). Only after Diaz intervened did PLP allow Ameca leave work to seek medical attention. (*Id.* at 7). Ameca also alleges that the area in which he worked was unsafe and that employees had requested PLP to install a dust collection system but their request went unanswered. (*Id.* at 8). He further alleges that PLP improperly pressured Jones to "put people back to work even after an injury" and PLP made it clear to Jones that he would lose his job if he did not do so. (*Id.* at 7).

Based on these allegations and viewing all the facts in a light most favorable to Ameca, the court still must find that the motion is due to be granted as to this claim. The plaintiffs simply have not sufficiently supported its position either legally or factually. As already noted, an outrage claim is available in very limited circumstances. In the present case, the facts do not fit within any of the recognized categories of conduct that constitute the tort of outrage. Although there might be instances where the tort of outrage is established in some other context, the present situation is not such an instance.

Although the plaintiffs state that the defendant placed Ameca in an unsafe area, forced him to continue working after he was injured, refused to give him leave, and caused him to suffer

"excruciating" pain, much of that is premised on evidence that the court was required to exclude. Admittedly, the allowable evidence shows that metal particles were in the air due to the nature of the work being performed. However, nothing demonstrates that the situation was sufficiently extreme to meet the difficult standard imposed on an outrage claim. Additionally, the record does not support a conclusion that the plaintiff was "forced" to return to work. Jones stated that he "sent" Ameca back to work. (Jones Aff. at ¶ 5). There is no evidence of "compulsion." The court recognizes the difficult situation in which Ameca found himself; however, that is not sufficient to allow this court to extend the boundaries for an outrage claim. Similarly, the evidence does not show that Jones "refused" to grant him leave. Although Jones stated that he did not send him to the doctor because of concerns about losing his job, nothing in his affidavit indicates that he felt at that juncture that anything further was required. Looking at the situation in a light most favorable to the plaintiff, and concluding that Jones acted out of fear for his job, nothing indicates that he acted with the requisite intent to cause the type of emotional distress required to state an outrage claim. Lastly, the court finds that Jones did not prevent Ameca from getting medical attention after he perceived that Ameca was in "excruciating" pain. To the contrary, his affidavit provides that he simply "placed some eye drops in his eye." There is no indication that Ameca was in "excruciating" pain at that juncture. A week after the incident when Diaz saw Ameca at work, "[h]is eye was visibly red and tearful" and he was in pain. Through her efforts, he was permitted to see an emergency room physician. Nothing in the record demonstrates that Jones was aware of Ameca's condition at that juncture and that Jones precluded Ameca from seeking medical attention while he was at work.

Despite the terrible consequences of this accident, the facts do not constitute the tort of

outrage as it is defined by the Alabama Supreme Court. In the cases finding an actionable claim, the defendant acted with an intent to cause the plaintiff emotional distress or acted with reckless disregard as to whether or not the plaintiff suffered emotional distress. *See e.g.*, *Traveler's Indemnity Co. of Illinois v. Griner*, 809 So. 2d 812 (Ala. 2001) (the plaintiff stated a claim against the defendants who were contractually obligated to provide medical care for him when they withhold reasonable and necessary items ordered by authorized treating physicians, knowing that their doing so would cause the plaintiff pain and frustration and could lead him to agree to a minimal settlement); *Continental Cas. Ins. Co. v. McDonald*, 567 So. 2d 1208, 1221 (Ala. 1990) (the evidence showed that the defendant systematically withheld payments in order to cause McDonald anguish over the possibility of the cessation of medical treatments for his pain and thereby to cause him to accept a less favorable settlement); *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322 (Ala. 1989) (sexual harassment); *Whitt v. Hulsey*, 519 So. 2d 901 (Ala. 1987) (desecration of family burial ground); *Levite Undertakers Co. v. Griggs*, 495 So. 2d 63 (Ala. 1986) (improper retention of remains to induce a payment of funeral expenses); *National Security Fire & Cas. Co. v. Bowen*, 447 So. 133 (Ala. 1983) (heavy handed and barbaric actions by agents of an insurer in an attempt to get the plaintiff to settle a claim). That aspect of an outrage claim is absent in this case.

**CONCLUSION**

Premised on the foregoing, the court finds that the defendant's motions to strike are due to be granted in part and denied in part. The court further finds that the defendant's motion to dismiss and for summary judgment is due to be denied in part and granted in part. As a consequence, the defendant's motion is due to be granted to the extent it seeks summary

judgment on the outrage claim and denied to the extent is seeks summary judgment on the remaining claims. Accordingly, the outrage claim will be dismissed with prejudice. An appropriate order will be entered.

The Clerk of the Court is directed to serve a copy of this memorandum opinion upon counsel of record in this matter.

**DONE**, this the 19th day of December, 2002.

JOHN E. OTT
United States Magistrate Judge