# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

ALFREDO AMECA-RODRIGUEZ and )
JULES LEYVA, )
)
      Plaintiffs, )
)
v. )     CV 01-JEO-2485-S
)
PREFORMED LINE PRODUCTS, )
)
      Defendant. )

## <u>MEMORANDUM OPINION</u>

In this action, plaintiffs Alfredo Ameca-Rodriguez ("Ameca") and Jules Leyva ("Leyva") (collectively "the plaintiffs") assert negligence, recklessness, intentional infliction of emotional distress, and loss of consortium claims against defendant, Preformed Line Products ("PLP" or "the defendant") as a consequence of a work place injury that resulted in the loss of Ameca's left eye. (Doc. 7).[1] Presently, before the court is the defendant's motion for summary judgment. (Doc. 77). The issues have been fully briefed by the parties. Upon consideration, the court finds that the defendant's motion for summary judgment is due to be granted.[2]

## FACTUAL SUMMARY[3]

Ameca moved from Mexico to Alabama with his wife and children and secured work

---

[1] References to "Doc.___" are to the numbers assigned by the Clerk of the Court to a particular pleading. References herein to "Ex.___" are to the exhibits attached to each document in a pleading. References to "p.___" are to the page.

[2] Premised on the court's ruling on the defendant's motion for summary judgment, the plaintiffs' motion to file a motion for summary judgment (doc. 80) and the plaintiffs' motion to consolidate (doc. 72) are moot.

[3] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiffs. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994). *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

through Briggs & Briggs ("Briggs").  (Doc. 7 at ¶ 4).  Briggs sent Ameca to work at PLP's

manufacturing plant in Alabaster, Alabama, where PLP manufactures cable anchoring and

control hardware systems.  (Doc. 7 at ¶ 6; Doc. 37 at ¶ 6; Affidavit of Robert L. Weber ("Weber

Aff.") at ¶ 3[4]).

Briggs primarily employs individuals seeking work in the light industrial area and assigns

them to various clients.  (Briggs Dep. 03, p. 9).[5]  Upon receiving a staffing request from a client,

Briggs contacts employees who previously have called in their availability.  (*Id*. at 11).  If an

employee is available and wants the assignment, then Briggs sends him to the client seeking help

for the available position.  (*Id*.).  Each employee has the right to decline any particular

assignment and still have an opportunity to accept other assignments.  (*Id*. at 46-47).  Once the

individual is at the assigned location, the client supervises the employee.  (*Id*. at 9, 26-27).

Briggs does not have supervisory personnel on site.  (*Id*. at 24).

PLP hires employees both directly and through an employee leasing service.  (Weber Aff.

at ¶ 3).  PLP reserves and exercises the right to direct and control the work of all of the

individuals on site regardless of whether they are employed directly or through the leasing

service.  (*Id*. at ¶ 5).  PLP scheduled the shifts and hours Ameca worked, assigned his work tasks,

provided the tools and equipment necessary to perform those tasks,[6] coordinated his work,

enforced safety regulations while the tasks were being performed, and inspected the final

---

[4] Weber's affidavit is located at document 13, exhibit A.

[5] William Briggs' deposition took place over the course of two days, December 8, 2003, and January 8, 2004.  This distinction is made in the record as "Briggs 03" and "Briggs 04."  Briggs' depositions are located at document 77, exhibits F and G.

[6] The only exception concerns eye protection, which was provided by Briggs.

product.  (Weber Aff. at ¶ 5; Affidavit of Deborah Stokes ("Stokes Aff.") at ¶ 3).[7]  At PLP,

administrative positions were treated differently than labor jobs.  (Affidavit of Todd Garzarek

("Garzarek Aff.") at ¶ 9).[8]  Persons with administrative responsibilities entered into a contract

with PLP.  (*Id*.).  Laborers were not interviewed by PLP and did not execute formal contracts

with PLP.  (*Id*.).

PLP regularly hired temporary employees through Briggs.  As standard practice, PLP

gave the temporary employees a raise after 30 or 90 days to show its appreciation if the

employee's work was satisfactory.  (Stokes Aff. at ¶ 5).  PLP did not have the authority to fire

Ameca but could end his work at PLP with the approval of his immediate supervisor and the

plant manager.  (Stokes Supplemental Affidavit ("Stokes Supp. Aff.") at ¶ 3).[9]

Although PLP did not have the right to terminate an employee, it could terminate the

employee's assignment at PLP.  (Briggs Dep. 03, p. 27).  To terminate an employee's assignment

at PLP, someone from PLP would tell the employee that his or her assignment was completed

and to report back to Briggs.  (*Id*. at 28).  Briggs did not restrict PLP in their ability to terminate

an employee's assignment to the PLP work site.  (*Id*. at 28).

### Pay and Benefits

PLP submitted an employee's hours to PLP headquarters in Ohio and to Briggs.  (Stokes

Aff. at ¶ 4).  The headquarters office paid Briggs $7.50 for every hour Ameca worked.  Briggs

then paid the plaintiff $6.00 per hour that he worked.  (*Id*. at ¶ 4).  Employee checks were sent

---

[7] The affidavit of Deborah Stokes is located at document 16, exhibit A.

[8] Garzarek's affidavit is located at document 15, exhibit 3.

[9] Stokes' supplemental affidavit is located at document 21, exhibit 1.

from Briggs to PLP and PLP distributed the paychecks to the employees, including the plaintiff. (*Id.* at ¶ 4).

PLP paid Briggs a fee for the use of their employees, which covered each employee's full salary and a "premium" in part "to provide worker's compensation insurance for" each employee. (Weber Aff. at ¶ 4). Briggs provided administrative services, such as calculating and deducting payroll taxes, for PLP. (Briggs Dep. 03, p. 9). Briggs paid the plaintiff's wages, calculated his tax withholdings, and maintained workmen's compensation insurance and benefits for Ameca. (Doc. 7 at ¶ 5; Garzarek Aff. at ¶ 6; Affidavit of Ameca ("Ameca Aff.") at ¶¶ 6, 10;[10] Weber Aff. at ¶ 4). "Alfredo [Ameca-Rodriguez] was an employee of Briggs and Briggs at that time. And Briggs and Briggs was responsible for administrative [matters]-anything dealing with the administrative, such as payroll, making sure the tasks were taken care of. And PLP was responsible for supervision, training, and assignment of duties. It is implied on the co-employer relationship." (Briggs Dep. 04, p. 11).

### Relationship between Briggs and PLP

PLP and Briggs never entered into a written contract for providing workers at the PLP site. (Weber Supp. Aff. at ¶ 4;[11] Briggs Dep. 03, p. 18). Briggs began assigning employees to PLP in the fall of 1999. (*Id.*). Briggs was not hired by PLP for a specific task, but rather was to provide individuals "to do whatever was required in the plant, whatever vacancy they had." (*Id.* at 21). Briggs sent individuals to PLP, not as teams or work crews. (*Id.* at 24).

The internal Briggs work order request for PLP, upon which the plaintiff is listed for

---

[10] Ameca's affidavit is located at document 26, exhibit 5A.

[11] Weber's supplemental affidavit is located at document 16, exhibit B.

assignment purposes, designates the length of the job as "T/P." (Doc. 77, Defendant's Exhibit

1). The "T/P" designation is an internal Briggs abbreviation standing for "temporary to

permanent," meaning he is temporarily on Briggs' payroll with the possibility of later moving to

PLP's permanent payroll. (Briggs Dep. 03, pp. 47-48). Briggs' understanding with PLP was that

"people will work on our [Briggs] payroll for twelve weeks, four hundred and eighty hours, and

if PLP desires, they could take them and put them on their payroll." (Briggs Dep. 04, p. 10). If

PLP hires them before the end of the term, Briggs is to receive the remaining payment due.

(Briggs Dep. 03 at 47).

> Briggs verbally authorized PLP to send employees to get necessary medical attention if an

accident occurred. (Briggs Dep. 04, p. 75).[12] This authorization included sending an employee

to the emergency room after business hours. (*Id.* at 75). Briggs' procedure concerning

on-the-job injuries provided that the injured employee was to report the injury to the PLP

supervisor at the location and have the supervisor report it to Briggs. (Briggs Dep. 04, p. 77).

### The Plaintiff's Situation

> When the incident giving rise to this suit occurred, the plaintiff worked as a metal grinder

at PLP's Alabaster plant. (Doc. 7 at ¶ 6). He completed his application with Briggs on January

17, 2000. He was assigned to and began working at PLP on Monday, January 24, 2000. (Briggs

Dep. 03, p. 29). He executed an express written agreement of employment with Briggs. (Briggs

Dep. 03, pp. 45- 46; Doc. 77, Ex. F at Defendant's Exhibit 1M (Briggs)). The agreement

provides, in pertinent part:

---

[12] There was no written instruction between PLP and Briggs on how to deal with employees who were injured on the job. (Briggs Dep. 04, p. 86).

> When you agree to accept assignments from Briggs & Briggs, Inc., you also obligate yourself to work and conduct yourself in a professional manner. If a company approaches you for/about permanent employment, you agree to notify Briggs & Briggs, Inc., IMMEDIATELY to make any/all necessary arrangements. Accepting permanent or temporary employment from a client of Briggs & Briggs, Inc., without prior consent from an authorized representative of Briggs & Briggs, Inc., you agree to pay Briggs & Briggs, Inc., a fee. The fee will not exceed 1040 hours times the client bill rate, attorney's fees, court costs, and interest computed at one and one half percent per month.

(Doc. 77, Ex. F at Defendant's Exhibit 1M (Briggs)).

On Friday, February 11, 2000, while the plaintiff was working at the PLP facility, a metal particle entered his left eye while he was grinding metal. (Doc. 7 at ¶ 9; Affidavit of Cecil Jones ("Jones Aff.") at ¶ 5[13]). The plaintiff reported the incident to his supervisor, Cecil Jones ("Jones"), who placed eye drops in his eyes and sent him back to work. (Jones Aff. at ¶ 5). Jones states he reported the plaintiff's injury to the plant manager, Peter Hanks. (Jones Dep., p. 93).[14] Jones did not send the plaintiff to see a physician, nor did the plaintiff receive any other medical attention at that time. (Jones Aff. at ¶ 5). He also did not seek medical attention on Saturday or Sunday, (February 12 and 13) because he did not know any physicians, nor could he afford to see one. (Doc. 7 at ¶ 12).

On Monday, February 14, 2000, the plaintiff returned to work at PLP and asked if he could go to the doctor. PLP, however, did not give him permission to leave work. (Doc. 7 at ¶ 13).[15] On Tuesday, February 15, 2000, while grinding metals, the plaintiff collapsed on the floor of his work area, apparently due to pain caused by his eye injury. (Doc. 7 at ¶ 14). At that point,

---

[13] Jones' affidavit is located at document 15, exhibit 1.

[14] Jones' deposition is located as an attachment to document 79.

[15] This statement is not supported by any evidence in the affidavits or other exhibits before the court.

PLP employee Mayra Diaz ("Diaz") intervened on his behalf and obtained permission from PLP to allow him to go to a doctor. (Diaz Aff. at ¶ 8).[16]  Diaz then called the doctors' office and explained the circumstances surrounding the injury, and that the plaintiff had been experiencing a great deal of pain. (Diaz Aff. at ¶ 9).

The plaintiff went with an interpreter to Comptrac, a medical facility designed "to evaluate, provide treatment, and/or refer to the pertinent specialist" for workers injured on the job. (Doc. 7 at ¶ 15).[17]  There, he saw Dr. Roberts, the attending physician. (Doc. 7 at ¶ 16).[18]  By this time, his eye had become visibly red and swollen. (Doc. 7 at ¶ 16). Dr. Roberts sent the plaintiff back to work "without restrictions." (Doc. 7 at ¶ 17; Doc. 37 at ¶ 8; Diaz Aff. at ¶ 10). On Friday, February 18, 2000, the plaintiff began to lose vision in his left eye and began feeling pain in his right eye. (Doc. 7 at ¶ 19).  Diaz again intervened and the plaintiff received permission to go to the doctor. (Diaz Aff. at ¶ 12).  However, this time, he went to the emergency room at Shelby Baptist Medical Center in Shelby County, Alabama. (Diaz Aff. at ¶ 12; Doc. 7 at ¶ 20).  Dr. Shelly Rhodes examined the plaintiff and determined that a piece of metal had become embedded in his left eye. (Doc. 7 at ¶ 20).

On Monday, February 21, 2000, the plaintiff saw Dr. Bruce Eich, an ophthalmologist, and learned that "an intraocular foreign body was embedded in his left eye and … that there was a

---

[16] Diaz's affidavit is located at document 15, exhibit 2.

[17] Briggs' deposition describes CompTrac as "not a medical provider. CompTrac discounts medical bills. And the doctors who go along with CompTrac agree to accept what CompTrac says the bill is worth, and that's what the insurance company pays." (Briggs Dep. 03, p. 96). Determining exactly what CompTrac does is not material to this motion.

[18] Briggs' deposition states he does not know if anyone at Briggs authorized Ameca to go to Dr. Roberts' office or any other medical facility before Ameca received treatment. There is no dispute that Dr. Roberts was the initial physician or that Dr. Roberts was the correct initial physician. (Briggs Dep. 03, pp. 96-99, 105-106).

hole in his eye." (Doc. 7 at ¶ 21).  Due to the difficulty of repairing this kind of damage, Dr.
Eich referred the plaintiff to a retinal surgeon, Dr. Richard M. Feist.  (Doc. 7 at ¶ 21).  Dr. Feist
performed surgery and attempted to repair the damage to the plaintiff's left eye.  (Doc. 7 at ¶ 23).
Unfortunately, because so much time had passed since the injury had occurred and because of the
extensiveness of the injury, the plaintiff had already suffered a total retinal detachment.  (Doc. 7
at ¶ 23).

        The plaintiff lost all vision in his left eye, had no light perception, and, according to Dr.
Feist, would never retain any useful vision in his injured eye.  Eventually Dr. Feist removed the
eyeball completely from the scleral shell.  (Doc. 7 at ¶ 25; Diaz Aff. at ¶ 15).  Because of this
final surgery, Ameca also "lost the optical sensation of depth perception" in his right eye.  (Doc.
7 at ¶ 26).

        Diaz paid for some of Ameca's medications and was later reimbursed by Briggs.  (Diaz
Aff. at ¶ 4).[19]

        The plaintiff could not return to work at PLP.  Briggs sent him home and indicated that it
needed to investigate the incident.  (Doc. 7 at ¶ 27).  Unable to secure other work during this
time, the plaintiff could not support his family and they were evicted from their apartment.  (Doc.
7 at ¶ 28).  Eventually, his wife and children left the United States and returned to Mexico to
seek help from family there.  (Doc. 7 at ¶ 28; Diaz Aff. at ¶ 18).

        The plaintiff filed suit in Shelby County Circuit Court and recovered workmen's
compensation benefits from a settlement with Briggs in August 2000.  (Doc. 7 at ¶ 27; Settlement
Petition and Order, Doc. 13, Exhibit B).  Thereafter, the present litigation was filed on October 3,

---

[19] A copy of the check from Briggs paid to Diaz is attached to her affidavit at document 15, exhibit 2.

2001. (Doc. 1). The defendant filed a Motion to Dismiss or in the alternative Motion for Summary Judgment on January 2, 2002. (Doc. 13). This court denied defendant's motion on December 19, 2002, for lack of sufficient evidence to show whether "Ameca and PLP entered into an implied contract of hire and whether Briggs acted as a temporary employment agency or as a labor broker." (Doc. 34, p. 53). After further discovery, the defendant filed the present Motion for Summary Judgment on January 20, 2004. (Doc. 77).

### SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991); *Adikes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by ... affidavits, or by 'deposition,

answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex,* 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing of sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter or law." *Anderson,* 477 U.S. at 259; *see Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745 n.11, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983); *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 643 (11th Cir. 1997). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586,

106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment

may be granted. *Anderson,* 477 U.S. 249 (citations omitted); *accord Spence v. Zimmerman,* 873

F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the

prism of the substantive evidentiary burden," so there must be sufficient evidence on which the

jury could reasonably find for the plaintiff. *Anderson,* 477 U.S. at 254; *Cottle v. Storer*

*Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility

determinations, the weighing of evidence, and the drawing of inferences is to be believed and all

justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant

need not be given the benefit of every inference but only the benefit of every reasonable

inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988). "If reasonable

minds could differ on the inferences arising from undisputed facts, then a court should deny

summary judgment." *Allen*, 121 F.3d at 643.

## DISCUSSION

The defendant argues that an implied contract existed between PLP and the plaintiffs

based on PLP's status as a "special employer," and, thus the exclusivity provisions of the

Alabama Workers' Compensation Act bar Ameca's claims. (Doc. 77). The plaintiffs counter

that Briggs was Ameca's sole and exclusive employer at the time of his accident. (Doc. 79, p. 4).

When a defendant in a common law action for damages asserts that the action will not lie

because the injured person or decedent was a "special employee" of the defendant, the defense is

an affirmative one, and the burden rests on the defendant to plead and prove it. *Bechtel v. Crown*

*Central Petroleum Corp.*, 451 So. 2d 793, 795 (Ala. 1984).

11

The Alabama Workers' Compensation Act provides in pertinent part:

> . . . [N]o employer shall be held civilly liable for personal injury to or
> death of the employer's employee . . . whose injury or death is due to an accident
> or to an occupational disease while engaged in the service or business of the
> employer, the cause of which accident or occupational disease originates in the
> employment. . . .

ALA. CODE § 25-5-53 (2000); *see also Ex parte State Dept. of Indus. Relations,* 848 So. 2d 251,

254 (Ala. 2002) ("The recovery of benefits by dependents following the death of an employee

caused by a work-related injury is governed by § 25-5-60, Ala. Code 1975."). The defendant

asserts that under Alabama law, "an employe[e] hired through a temporary employment agency is

an employee of his general employer (the employment agency) and his special employer (the

employer to which the employment agency assigned the employee)." (Doc. 77 at 6). *See also*

*Marlow v. Mid South Tool Co.*, 535 So. 2d 120, 123 (Ala. 1988) ("In three decisions, beginning

in 1983, this Court has established, for workmen's compensation purposes, that a temporary

services employee is the employee of both his or her general employer (i.e., the employment

agency) and his or her special employer (i.e., the employer to which the employment agency

assigned the employee to work.")).

The first Alabama court to address this issue in a published opinion was the Alabama

Supreme Court in *Terry v. Read Steel Products*, 430 So. 2d 862 (Ala. 1983). In *Terry*, the

plaintiff was injured while working for defendant Read Steel. Although the record is unclear, it

appears that Manpower, Inc., an employment agency, provided Read with temporary laborers.[20]

*Id.* at 863. After he was injured, Terry sought and received workman's compensation benefits

---

[20] The court specifically states this on page 863; however, the quoted testimony of Terry provides that he was hired by the
defendant at the plant and he never went to Manpower. *Terry*, 430 So. 2d at 866. Yet, the plaintiff's testimony also was that he
went to Manpower after his accident to get his compensation check. *Id.*

from Manpower and then brought suit against Read. Read filed a motion for summary judgment,

asserting that it was immune from suit under the workman's compensation laws. *Id.* The trial

court granted the motion. On appeal, the Alabama Supreme Court affirmed. The Supreme Court

adopted a test to determine whether an employee from a temporary or placement agency was also

an employee of the company he was assigned to work. The Supreme Court stated as follows:

> "When a general employer lends an employee to a special employer, the
> special employer becomes liable for workmen's compensation [and therefore
> exempt from civil liability] only if
>
>> (a) the employee has made a contract of hire, express or
>> implied, with the special employer;
>> (b) the work being done is essentially that of the special
>> employer; and
>> (c) the special employer has the right to control the details
>> of the work.
>
> "When all three of the above conditions are satisfied in relation to both
> employers, both employers are liable for workmen's compensation . . . ."

*Terry*, 430 So. 2d at 865 (quoting 1C A. Larson, *The Law of Workmen's Compensation*, § 48

(1980)). The *Terry* court found that the requirement that there be a contract of hire, either

express or implied, between the employee and the employer was the most important factor in the

consideration. *Id.* at 866. Analyzing the facts, the court noted that Terry had not gone to the

temporary placement agency, but instead was hired directly by the defendant, the special

employer, and only was paid by the placement agency. *Id.* Under these facts, the court held that

Terry was a Read employee for worker's compensation purposes. *Id.*

As noted by this court in its earlier opinion in this case:

> Two years after *Terry*, the Alabama Supreme Court was again faced with a
> similar question in *Pettaway v. Mobile Paint Manufacturing Co., Inc.*, 467 So. 2d
> 228 (Ala. 1985). Pettaway was burned severely by an explosion on the premises

13

of Mobile Paint after he was placed there by Manpower, Inc.  Approximately three
months before Pettaway suffered his injuries, he had gone to Manpower, and
filled out an application in an effort to obtain work.  During the intervening three
months, he had returned to Manpower several times to receive work assignments.
Manpower sent him to different job sites for the purpose of providing temporary
labor.  Approximately two weeks before his injury, Manpower informed Pettaway
of an available work assignment at Mobile Paint.  Pursuant to the normal
procedure, Manpower asked Pettaway if he would accept such an assignment.
Pettaway agreed to do so.  Pettaway stopped by Manpower to pick up a time sheet.
He then went to the Mobile plant and performed ordinary labor.  He went to
Manpower at the end of each week to get a new time sheet and receive a pay
check.  He was paid $3.75 an hour by Manpower, which in turn charged Mobile
Paint $5.34 an hour for his services.  A portion of the difference was used by
Manpower to purchase Workmen's Compensation insurance.  Pettaway's work
was directed and supervised exclusively by Mobile Paint, with the exception that
written permission from Manpower was necessary before he could handle vehicles
or machinery.  Pettaway and his wife filed suit against Mobile Paint and others,
alleging negligence and breach of contract.  The trial court granted the motion for
summary judgment filed by Mobile Paint.  On appeal, the Alabama Supreme
Court stated that the single question was whether Mobile Paint was immune from
suit.  Affirming the trial court, the Supreme Court stated as follow:

> The dispositive facts of this case are indistinguishable from
> those presented in *Terry v. Read Steel Products*, 430 So. 2d 862
> (Ala. 1983).  In *Read Steel*, this court upheld a summary judgment
> entered in favor of the defendant, Read Steel, on the basis that
> Read Steel was immune from suit as an employer under the
> Workmen's Compensation Act.  *Read Steel*, as does this case,
> involved a situation where a general employer (Manpower, Inc.)
> merely provided laborers to special employers and then performed
> clerical tasks for the special employer.  This court noted that in
> such a situation, the dispositive test to be applied is whether a
> contract of hire existed between the special employer and the
> employee, in this case Mobile Paint and Jonas Pettaway.  After
> reviewing the entire record we find that: (1) An implied contract of
> hire existed between Pettaway and Mobile Paint; (2) Pettaway's
> work was essentially that of Mobile Paint; (3) Mobile Paint had the
> right to control the details of the work.  Accordingly, Mobile Paint
> is immune from civil liability for the injuries suffered by Pettaway.
> *Terry v. Read Steel Products*, 430 So. 2d 862 (Ala. 1983); Code
> 1975, § 25-5-53.

In *Tweedy v. Tennessee Valley Authority*, 882 F.2d 477, 480 (11th Cir.

1989), the Eleventh Circuit was presented with the question of whether Tweedy, who was injured at a Tennessee Valley Authority ("TVA") facility, was precluded from suing the TVA due to the fact that it was a special employer. The facts showed that

> . . . Gilbert/Commonwealth, Inc. ("Gilbert") entered into a staff augmentation contract wherein it agreed to provide "personnel to perform general engineering . . . services related to TVA's nuclear . . . power plants in accordance with criteria, procedures, and scheduling requirements established by [TVA]." Under the contract Gilbert was to provide personnel to work under TVA's supervision to supplement TVA's regular engineering staff at the Browns Ferry Nuclear Plant ("BFNP").

> The contract also provided: (1) All Gilbert employees performing work on TVA's premises must meet citizenship requirements, undergo a medical examination, and submit to a security investigation identical to that of regular employees; (2) TVA promised (a) to reimburse Gilbert for the wages it paid to employees providing services to TVA and (b) to pay a fixed percentage of these wages for overhead expenses; (3) Gilbert promised to provide for worker's compensation insurance out of the money it received from TVA; and, finally, (4) TVA reserved the right to control the work performed by Gilbert supplied workers. . . .

> Tweedy applied for work at BFNP in the field engineering section in December, 1986. Initially, two TVA managers interviewed Tweedy and then referred him to Gilbert for employment. Thereafter he was processed through TVA's personnel, health physics, medical and other offices, and attended its training classes (including courses in industrial safety requirements for entering nuclear contaminated zones). Tweedy then began working as an engineering aide, on Gilbert's payroll, but under the supervision of TVA employees.

After discussing the holdings in *Terry* and *Pettaway*, the court stated that

> . . . in *Marlow v. Mid South Tool Co.*, 535 So. 2d 120 (Ala. 1988), the court held that Mid South was a special employer when the injured employee was obtained from the temporary agency, Kelly

15

Services.[21]

The fourth case, and the only one not involving a temporary
agency is *Bechtel v. Crown Central Petroleum Corp.*, 495 So. 2d
1052 (Ala. 1986). There Crown entered into a personnel supply
contract with Pep Services, Inc. (Pep), which undertook to supply
Crown with personnel to operate retail service stations. *Id.* at
1054. The contract obligated Crown to pay the employee's wages,
worker's compensation insurance, social security contributions, as
well as a service charge. Bechtel, the plaintiff worker, was hired
by Pep and assigned to work at one of Crown's gas stations where
he slipped and fell while working. After receiving payment under
the Alabama Workmen's Compensation Act, Bechtel sought a tort
recovery against Crown. The trial court granted summary
judgment in favor of Crown holding that, as a special employer,
Bechtel's suit against it was barred. *See id.* at 1053-54. The
Alabama Supreme Court upheld the trial court's decision and
relied on the following facts: (1) Bechtel was under the supervision
of a Crown employee; (2) Bechtel wore uniforms supplied by
Crown; (3) Crown participated in the hiring process; (4) a Crown
employee signed Bechtel's time sheets; and (5) a Crown employee
had authority to terminate Bechtel's employment. *Id.* at 1054.

*Tweedy*, 882 F.2d at 480 (footnote added). Affirming the trial court's dismissal of
the action, the court stated:

. . . . First, we note that the contract between Gilbert and TVA
clearly provides: "All work done by Contractor hereunder shall be
reviewed by TVA and subject to TVA approval. TVA shall retain
overall responsibility for the technical adequacy of the work when
such work is performed under TVA supervision." Second, while
Tweedy's affidavits suggest that Gilbert employees worked in
Tweedy's area and exercised limited supervisory functions over his
work, substantial evidence eliminates any genuine dispute
concerning Tweedy's submission to the control and supervision of
his TVA supervisor, Presley. Tweedy received his day-to-day
assignments from Presley. Further, to the extent that any Gilbert
co-workers may have exercised any limited supervisory authority

---

[21] In *Marlow*, the plaintiff applied for employment with Kelly by filling out an application and taking a dexterity test, which was
part of an arrangement between Kelly and the defendant-employer Mid South. *Marlow*, 535 So. 2d at 121-22. The plaintiff was
hired the next day and reported directly to Mid South where she was trained and her time card was located. *Id.* at 122. She was
supervised on-site by a Mid South foreman. *Id.* Mid South had the ability to request that any unsatisfactory worker be removed
by Kelly from the assignment. *Id.*

> over Tweedy, this was done only at the behest of Presley. The
> "control" that the "special employer" must assume need not extend
> to the technical details of a skilled employee's activity. To hold
> otherwise would tend to strip skilled employees of the protection of
> workmen's compensation acts. *See* 1C A. Larson, *supra*, § 48.30
> at 8-502. Additionally, TVA had the responsibility for training
> Tweedy and designating his work schedule. TVA furnished
> Tweedy with all the equipment needed to perform his job,
> including his uniform. TVA had the right to fire Tweedy. The
> control necessary to invoke the "special employer" doctrine has
> been demonstrated by evidence not subject to genuine dispute.

*Tweedy*, 882 F.2d at 480.

In *Hicks v. Alabama Power Co.*, 623 So. 2d 1050 (Ala. 1993), the court
distinguished between temporary employment agencies and labor brokers and
stated that when a person applied to a temporary employment agency

> it was not for the purpose of entering into employment with those
> companies to do the work of those companies; rather the plaintiffs
> intended for the general employers to 'market' them to secure
> employment with another, special employer. Once those plaintiffs
> were presented by the employment services to the special
> employers, those plaintiffs then entered into a contract of hire with
> those special employers.

*Hicks*, 623 So. 2d at 1055. The plaintiff in *Hicks* presented evidence that he had
been sent by his union to a placement agency which performed construction
services for the defendant. *Id.* The plaintiff also presented evidence that the
placement agency had paid his workers' compensation and medical benefits and
that his paychecks came from the placement agency. *Id.* The court held that the
defendant had not produced evidence to show that the plaintiff consented to new
employment with them. *Id.* Since the plaintiff had submitted substantial evidence
which was in dispute, his consent could not be implied. *Id.* The court also
reviewed cases from other jurisdictions, including *Crain v. Webster Electric
Coop.*, 568 S.W.2d 781 (Mo. App. 1978) (holding that consent to a special
employment relationship "cannot be inferred merely from the fact that the
employee obeyed the commands of his master in entering the services of another;"
the employee's consent must be express, "informed and deliberate," to create an
implied contract of hire with the alleged special employer); *Latham v. Technar,
Inc.*, 390 F. Supp. 1031, 1039 (E.D. Tenn. 1974) (holding that the plaintiff must
have knowledge of, and must consent to, a special employment relationship; the
mere fact that her activities may have been controlled by the new master is not

17

sufficient to create a new relationship in the absence of an express or implied contract); *Clark v. Luther McGill, Inc.*, 127 So. 2d 858, 862 (Miss. 1961) (holding that the employee must consent to become the employee of the purported special employer before a contract of hire may be implied); *Selid Construction Co. v. Guarantee Ins. Co.*, 355 P.2d 389, 393 (Alaska 1960) (holding that consent of an employee to a change in employers cannot be implied merely from his obedience to the orders of his master to serve another). *Hicks*, 623 So. 2d at 1055-56. The court then held that whether the plaintiff had consented to be an employee of the defendant was a question of fact and affirmed the denial of the motion for summary judgment. *Id.*

In *Gaut v. Medrano*, 630 So. 2d 362 (Ala. 1993), the Alabama Supreme Court again looked at the issue of whether an employee of a general employer who went to work for another company became the employee of the special employer for purposes of determining the application of the exclusivity provisions under the Alabama Workers' Compensation Act. The court defined special employers as "'individuals or businesses who, for practical purposes, may be considered primary or co-employers of the injured employee.'" *Gaut*, 630 So. 2d at 364 (quoting *Rhodes v. Alabama Power Co.*, 599 So. 2d 27, 28 (Ala. 1992), *Tweedy*, 882 F.2d at 479). The court further defined an employee as a "'person in the service of another under any contract of hire, express or implied, oral or written.'" *Gaut*, 630 So. 2d at 364 (quoting Ala. Code § 25-5-1(5) (1975)). The plaintiff in *Gaut* had been hired by an employment agency and sent to the defendant's workplace to provide general labor on a temporary or as needed basis. *Gaut*, 630 So. 2d at 363. The money the defendant paid the employment agency included a fee for the laborers working on their premises which covered payroll; taxes; insurance, including worker's compensation benefits; overhead; and a profit. *Id.* After the plaintiff had been injured and brought suit, the defendant argued that the Alabama Workers' Compensation Act barred any civil action because, under the *Terry* test, the plaintiff had become an employee of the special employer-defendant. *Id.* at 363-64. The court explained that in order for the plaintiff to have become an employee of the special employer-defendant, there must have been a contract of hire, either express or implied, between the plaintiff and defendant. *Id.* at 365. It stated, "This is an important determination, for when a person enters into an employer-employee relationship with a party, that person gives up valuable rights, including the common law right to bring an action against the party for any injury he might suffer while acting in the scope of his employment." *Id.* Quoting Professor Larson, the court wrote:

> In compensation law, the spotlight must . . . be turned upon the employee, for the first question of all is: Did he make a contract of hire with the special employer? If this question cannot be answered "yes," the investigation is closed, and there is no need to

go on into tests of relative control and the like.

> This must necessarily be so, since the employee loses
> certain rights along with those he gains when he strikes up a new
> employment relation.  Most important of all, he loses the right to
> sue the special employer at common law for negligence; and when
> the question has been presented in this form, the courts have
> usually been vigilant in insisting upon a showing of a deliberate
> and informed consent by the employee before employment relation
> will be held a bar to common-law suit.

*Gaut*, 630 So. 2d at 365 (quoting 1C A. Larson, *The Law of Workmen's Compensation*, § 48 (1980)).  The court distinguished between labor brokers and temporary employment agencies in the same way the court had in *Hicks*, reemphasizing that an employee "who applies to the general employer for the specific purpose of temporary placement with special employers . . . necessarily agrees to a contract of hire with the special employer." *Gaut*, 630 So. 2d at 366. The court also recognized the difference when dealing with a labor broker because "it may or may not be obvious to an employee that the nature of his employment with one employer is such that he is impliedly agreeing to a contract of hire with another entity operating as a 'special employer.'" *Id*. at 367.  The court then looked at various factors of the employment at issue to determine whether the plaintiff had entered into a contract of hire with the defendant, including who provided the clothes and safety equipment necessary for the work, who supplied his work tools, who managed the administrative details of his employment, whether the defendant had a right to terminate the plaintiff for unsatisfactory work performance, how long the general employer had been providing employees to the special employer, and how long the employee worked for the defendant employer. *Id*. at 366-67.

> The *Gaut* court found that the general employer handled all of the details of the plaintiff's work and provided all of his tools and safety equipment, but the special employer-defendant retained the right to terminate the plaintiff if his work had been unsatisfactory.  *Id*.  Under these facts, the court held that whether the plaintiff had become an employee for workers' compensation purposes of the special employer-defendant and whether there had been an implied contract of hire was a question of fact for the fact finder.

(Doc. 34 at 42-49).

Premised on the foregoing authorities, the pertinent question is whether the defendant has

demonstrated as a matter of law that it is entitled to the status of a "special employer" under the

State's worker's compensation laws. The three elements enumerated in *Terry* are dispositive. That is, the defendant must demonstrate (1) that the plaintiff made a contract of hire, express or implied, with PLP; (2) the work being done was essentially that of PLP; and, (3) that PLP had the right to control the details of the work. *Terry*, 430 So. 2d at 865.

As determined in the court's previous opinion regarding this issue, the second and third elements of *Terry*, that the work Ameca was doing was essentially that of PLP and that PLP had the right to control the details of his work, were easily satisfied under the facts. (*See* Doc. 34, p. 50). Nothing in the expanded record changes the court's prior determination. The remaining question is whether there was an implied contract of hire between PLP and Ameca in this case as a matter of law.[22] Stated differently, the issue is whether Briggs is a temporary employment agency or some type of independent contractor or labor broker performing services onsite for a client. Ameca asserts that under *Gaut*, Briggs is the employer precluding special employer status for PLP.

Under *Gaut,* if there is sufficient evidence in the record for a jury to conclude that a reasonable person in the plaintiff's position could have concluded that Briggs was an independent contractor, it could similarly conclude that the plaintiff did not impliedly consent to a contract of hire with PLP, thus precluding summary judgment. *Gaut*, 630 So. 2d at 365-66. If the evidence, when viewed in a light most favorable to the plaintiff, fails to support a jury determination that Briggs is an independent contractor, summary judgment is due to be granted the defendant. If the record demonstrates as a matter of law that Briggs is a temporary employment placement agency, then an employment agreement may be inferred between the

_____

[22] Because there was no written contract, there is no argument that there was an express agreement.

plaintiff and PLP.

At the outset, the court finds that the evidence demonstrates that Briggs & Briggs'
method of operation was akin to that of Manpower in *Terry* and *Pettaway* and Kelly Services in
*Marlow*. It was not a labor broker or independent contractor, but a temporary employment
agency. In resolving this issue, the court finds the following previously articulated factors
helpful: (1) the hiring practices involved, (2) who supplied the work clothes and safety
equipment required for the work, (3) who supplied the work tools, (4) who managed the daily
activities of the plaintiff including scheduling work shifts and breaks, (5) who handled the
administrative details, including time keeping, payroll records, issuing checks, workmen's
compensation and insurance, (6) whether the defendant had a right to terminate the plaintiff for
unsatisfactory work performance, (7) how Briggs had been supplying employees to the PLP,
(8) how long the plaintiff worked for Briggs, (9) how long the plaintiff worked at the defendant's
facility, and (10) how uninvolved Briggs was at the defendant's facility.

As to the first factor, the hiring practices, Briggs stated in his deposition that his company
was a staffing service. (Briggs Dep. 03, p. 22). It advertised generally for employees to fill
various position. Some employees, but not the plaintiff, completed applications at PLP, which
were forwarded to Briggs for consideration. (*Id*. at 46-47). An applicant had the ability to accept
or decline a particular assignment without detriment to further consideration. Briggs provided
employees to PLP upon specific request. Furthermore, Briggs and PLP did not have a written
contract. (*Id*. at 18). Briggs designated the PLP workers, including the plaintiff, as "T⇒P"
employees. This designation meant that they were temporary to permanent employees who
would begin on Briggs' payroll and if, after a period of time, PLP was satisfied with their work,

21

they would be shifted to PLP's payroll. This evidence is consistent with the activities of a temporary employment service and not a labor broker or independent contractor.

As to the second factor, providing work clothes and safety equipment, no evidence exists that either Briggs or PLP provided Ameca with any necessary work clothing. Briggs did provide its employees with the safety glasses which were intended to be used while grinding metal for PLP.[23] However, this fact is not particularly helpful in determining whether Briggs was a temporary employment service, a labor broker, or an independent contractor.

As to the third factor, work tools, there is no evidence that Briggs provided any work tools or machinery for the plaintiff to use. To the contrary, the evidence demonstrates that the equipment for performing the grinding work done by Ameca was substantial and therefore already on the defendant's site. This tends to demonstrate once again that Briggs was a temporary employment service.

As to the fourth factor, management of Ameca's daily activities, the evidence shows that PLP directed Ameca's work assignments and scheduled his shifts and breaks. (Weber at ¶ 5; Briggs Dep. 03, pp. 9, 26, 27). Additionally, Briggs had no supervisory personnel on site at PLP's facility. (*Id*. at 24). This is strongly indicative that Briggs was a temporary employment service.

As to the fifth factor, the administrative details, Briggs handled most administrative

---

[23] This fact is disputed in two separate places in the evidentiary record but is not specifically challenged by the defendants in their motion. In Ameca's deposition given in the Briggs worker's compensation case he states PLP gave him glasses. (Ameca's deposition located at document 77, exhibit A at p. 22). In Jones' deposition, he states PLP provided safety glasses, gloves, and earplugs. (Jones deposition located at document 79, attachment at pp. 143-44 and 178). While disputed, the court does not consider this dispute material.

matters concerning Ameca's employment. Briggs determined his salary,[24] handled the paperwork concerning his employment, prepared his paychecks on a Briggs' account, and provided him with health and worker's compensation insurance. (Weber Aff. at ¶ 4). Briggs described the relationship between PLP and Briggs as a "co-employer relationship." (Briggs Dep. 04, pp. 11-19). PLP stated they could give the employee (such as the plaintiff) a pay raise after a certain period of satisfactory work. (Stokes Aff. at ¶ 5). Finally, the evidence demonstrates that PLP handed out the Briggs checks to the Briggs employees. (*Id.* at ¶ 4). The court also notes that Briggs reimbursed Diaz for the $17.71 paid for the plaintiff's medicine following the accident. (Diaz Aff. at ¶ 4). Nothing in the evaluation of this factor precludes the conclusion that Briggs was a temporary employment agency.

As to the sixth factor, the right of termination, PLP could end an employee's assignment at their facility, but could not have the employee terminated from Briggs. (Stokes Supp. Aff. at ¶ 3; Briggs Dep. 03, p. 27). Briggs did not restrict PLP in its ability to terminate an individual's assignment to the PLP facility. (Briggs Dep. 03, p. 28). This situation is strongly indicative of the fact that Briggs was a temporary employment agency. This is particularly the case because termination of an employee's assignment did not preclude his being assigned elsewhere.

As to the seventh factor, the length of time that Briggs had been supplying employees to PLP, the record demonstrates that this relationship began in the Fall of 1999. The relationship appears to have been the same from the beginning until the time the plaintiff was injured. As already stated, it was consistent with that of a temporary employment agency and an employer looking for temporary help.

---

[24] After negotiations with PLP.

23

As to the eighth and ninth factors, the plaintiff's time with the general employer and at the defendant's facility, the record demonstrates that the plaintiff completed his application with Briggs on January 17, 2000, and began his first assignment at PLP on January 24, 2000. (Briggs Dep. 03, p. 29). He worked there until his accident in mid-February. Thereafter, he did not return to work and did not receive any further assignments from Briggs. This evidence adds little to help resolve this issue.

Considering the tenth factor, the general employer's involvement at the defendant's facility, as also previously noted, the record shows that Briggs did not have a supervisor onsite at PLP. (Weber at ¶ 5; Briggs Dep. 03, p. 24). The record is undisputed that Briggs sent employees to PLP at PLP's request to fill vacancies as needed and not for specific tasks. (Briggs Dep. 03, p. 21). These factors are strongly indicative that Briggs was a temporary employment agency.

Premised on the foregoing analysis, the court finds that the motion for summary judgment is due to be granted. PLP is entitled to the legal status of "special employer" under the present circumstances.

The plaintiffs argue that the motion is due to be denied particularly premised on the holding of *Gaut* and because the plaintiff believed that he worked for Briggs and not PLP. The court, however, finds that the present situation is distinguishable from *Gaut*.

Nothing in the record suggests that Briggs was as involved with the activities at PLP's facility as was the employee leasing firm in *Gaut*. The Court in *Gaut* specifically found that

> Gaut submitted substantial evidence that Industrial [(the purported general employer)] presented itself to him as an independent contractor performing maintenance services and that Holnam either reinforced this appearance or did nothing to contradict it. He may have reasonably viewed Holnam simply as a premises owner that had reserved a right to control its contractor's performance.

24

*Gaut*, 630 So. 2d at 367-68. Additionally, in *Gaut*, the employment application identified the general employer as a "general contractor." *Id.*, 630 So. 2d at 363. Still further, the general employer had an office at the plant location. *Id.* In the present matter, however, Briggs' application clearly states in its letterhead that it is a "staffing service." (Doc. 77, Exhibit B, Defendant's Exhibit 1, 3-8, 12-13). Additionally, in *Gaut*, the general employer and the defendant, a purported special employer, had a written contract for maintenance of the defendant's plant (*Gaut*, 630 So. 2d at 363); the contract specifically identified the general employer as a contractor (*id.*); and it (the general contractor) had an onsite office and supervisors (*id.*). These significant facts are absent in this matter.

The court also notes that this case is distinguishable from *Hicks* where the union was acting in a manner akin to an independent contractor. *See Hicks*, 623 So. 2d at 1053-54. Still further, the contract involved in *Hicks* specifically referred to the general employer as an independent contractor. *Id.*

PLP paid Briggs a premium over the wage allocated to the plaintiff for the purpose of covering the administration services such as taxes and insurance, including for workers' compensation.[25] As stated in *Terry*, the defendant (PLP) is paying the general employer (Briggs) for something more with the premium and one of those items is workman's compensation insurance. Because the plaintiffs are suing in tort the entity who paid for the insurance, the court finds that the claims are precluded as a matter of law under § 25-25-53 of the Alabama Workers' Compensation Act. *Terry*, 430 So. 2d at 865.

While the facts in the instant matter are different from those in *Hicks*, the Alabama

---

[25] The premium was $1.50.

25

Supreme Court's description of a temporary employment agency therein fits Briggs' role in this matter. The plaintiff completed an application with Briggs for work. That application clearly stated that it was a staffing service. Briggs' actions were consistent with those of a temporary employment agency and not those of a labor broker or independent contractor. Briggs employees were assigned individually, not as a team or work crew. (Briggs Dep. 03 at 24 & 49). Briggs was not hired by PLP to perform a specific job or assignment, but to provide limited personnel for activities in the grinding area that were a part of PLP's overall operation. Briggs supplied employees only on an as needed basis.

Briggs has not taken on the responsibilities associated with an independent contractor under the foregoing factors. For instance, Briggs did not have a supervisor at PLP and PLP was in control of Ameca's activities while at the job site. This evidence is undisputed.

Lastly, the plaintiffs argue that the court should find that PLP is not entitled to a finding that it was a "special employer" because Ameca believed that he was an employee of Briggs and not PLP. In *Gaut*, the plaintiff asserted

> . . . that he had no knowledge of the agreement between Holnam and Industrial; he states that he always believed that Industrial, not Holnam, was his employer; and he states that he believed that only Industrial could terminate his employment. He argues that he believed he was working for Industrial and that he believed Industrial was an independent maintenance contractor.

*Gaut*, 630 So. 2d at 365. In response, the court stated that

> Gaut's statement of his understanding of the situation is supported by the evidence, from which a jury could conclude, from all appearances, that Industrial was an independent contractor performing maintenance and other services. If a jury finds that a reasonable person in Gaut's position could have concluded that Industrial was an independent contractor performing maintenance services for Holnam as the premises owner, the jury could find that Gaut did not impliedly consent to a contract of hire with Holnam.

26

*Id.*, 630 So. 2d at 365-66.

The plaintiff's belief is certainly a matter the court should consider. However, it is not dispositive. There must be objective support for the same in the record.[26] That is absent in this case.

Unlike the situation in *Gaut*, the present record does not support a jury finding that Briggs was an independent contractor performing specific tasks and services at the PLP job site. Had the record been otherwise, his argument would carry more weight. However, examining the entire record, including Ameca's belief under the circumstances, the court finds that the facts do not allow for a conclusion that Briggs was an independent contractor or a labor broker, precluding PLP the status of a "special employer."[27]

---

[26] *See Gaut*, 620 So. 2d at 367 ("[I]t may or may not be obvious to an employee that the nature of his employment with one employer is such that he is impliedly agreeing to a contract of hire with another entity operating as a 'special employer.'").

[27] To the extent that the plaintiffs appear to be asserting that the motion should be denied because Ameca did not understand the employment relationship due to the fact that he speaks only Spanish, the court disagrees. There is no evidence of coercion or other improper conduct on the part of Briggs that would cause the court to nullify Ameca's execution of the employment agreement on January 6, 2000.

Alabama law is clear that a party is presumed to understand an agreement voluntarily signed. *Patrick Home Centers, Inc. v Carr*, 730 So. 2d 1171, 1174 (Ala. 1999). *See also Green Tree Agency, Inc. v. White*, 719 So. 2d 1179, 1180 (Ala. 1998) ("'[O]rdinarily when a competent adult, having the ability to read and understand an instrument, signs a contract, he will be held to be on notice of all the provisions contained in that contract and will be bound thereby.' *Power Equipment Co. v. First Alabama Bank*, 585 So. 2d 1291, 1296 (Ala. 1991))." The Alabama Supreme Court has recently stated:

Melvin argues that his illiteracy and his wife's semiliteracy should render the arbitration agreement invalid; this argument is without merit. In *Nissan, Inc. v. Foster*, [Ms. 1982183, June 23, 2000] ---So. 2d--- (Ala. 2000), this Court addressed a similar argument:

Foster argues that he should be relieved of this contractual obligation because he has only a sixth-grade reading level. However, this rule has long been established in Alabama: "'[A] person who signs an instrument without reading it, when he can read, can not, in the absence of fraud, deceit or misrepresentation, avoid the effect of his signature, because [he is] not informed of its contents; and the same rule [applies] to one who can not read, if he neglects to have it read, or to enquire as to its contents.' *Beck & Pauli Lithographing Co v. Houppert and Worcester*, 104 Ala. 503, 506, 16 So. 522, 522 (1894) (emphasis added [in *Mitchell Nissan*]). *Accord Gaskin v. Stumm Handel GmbH*, 390 F. Supp. 361, 366 (S.D.N.Y. 1975) ("'If the signer could read the instrument, not to

(continued...)

## CONCLUSION

Premised on the foregoing, the court finds that the defendant's motion for summary judgment is due to be granted. The evidence clearly demonstrates that Briggs acted as a temporary employment agency and not as an independent contractor or labor broker. Accordingly, PLP is entitled to the status of a special employer under the circumstances. The plaintiffs' relief is therefore limited to that which they have received previously under the Worker's Compensation Act. An order consistent with the court's findings herein will be entered.

**DONE**, this the ___ day of March, 2004.

_____
**JOHN E. OTT**
United States Magistrate Judge

---

[27](...continued)
have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him.""). Foster was aware that he was signing a contract to purchase the automobile, and he does not allege that his signature was procured by fraud, deceit, or misrepresentation. Although Foster was aware of his limited reading ability, he did not ask his relatives who had accompanied him, or a representative of Mitchell Nissan, to read the agreement to him. Morever, Foster did not tell a representative of Mitchell Nissan that he was unable to read or to understand any portion of the contract. Accordingly, Foster cannot avoid his contractual obligation by now asserting that he could not read the contract or understand it. *See id.*"

*Johnnie's Homes, Inc. v Holt*, 790 So. 2d 956, 960 (Ala. 2001).

Although these cases are obviously factually distinguishable, the underlying premise is instructive. Ameca cannot use his language barrier as a basis to disregard the contract in this matter.